# EXHIBIT C

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                         AT CHARLESTON

3

4

5    JESSICA A. STOLER,

6         Plaintiff,

7    v.              CIVIL ACTION NO. 2:18-cv-0988

8    PENNYMAC LOAN SERVICES, LLC,

9         Defendant.

10

11

12

13

14

15        The deposition of KAREN SCOTT, taken upon oral
     examination, pursuant to notice and pursuant to the
16   Federal Rules of Civil Procedure, before Lisa M. Short,
     Certified Court Reporter and Notary Public in and for
17   the State of West Virginia, Monday, August 5, 2019, at
     1:31 p.m., at the offices of Goodwin & Goodwin, 300
18   Summers Street, Charleston, West Virginia.

19

                   JOHNNY JACKSON & ASSOCIATES, INC.
20                    606 Virginia Street, East
                        Charleston, WV 25301
21
                          (304) 346-8340
22

23

24

**APPEARANCES**

On behalf of Jessica Stoler:

MOUNTAIN STATE JUSTICE
Bren Pomponio, Esquire
1217 Quarrier Street
Charleston, WV  25301
(304) 344-3144

On behalf of PennyMac Loan Services, LLC:

GOODWIN & GOODWIN, LLP
Carrie Fenwick, Esquire
300 Summers Street, Suite 1500
Charleston, WV  25328
(304) 346-7000

BLANK ROME, LLP
Frank Crowley, Esquire
One Logan Square
130 N. 18th Street, 3rd Floor
Philadelphia, PA 19103
crowley@blankrome.com
(215)569-5627

1                    EXAMINATION INDEX

2
KAREN SCOTT                                    Page
3        BY MR. POMPONIO                        4
         BY MR. CROWLEY                        38
4        BY MR. POMPONIO                       41
5                      EXHIBIT INDEX

6                                              Page
    Exhibit
7    1        Servicing Notes                  12

8    2        Corporate Advance History        15

9    3        Correspondence Sent December 21st, 2017    19
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                 KAREN SCOTT, DEPONENT, SWORN

2                         EXAMINATION

3    BY MR. POMPONIO:

4         Q.    Good afternoon.  My name is Bren Pomponio, and

5    I represent Jessica Stoler in a case that was filed in

6    the, it's now pending in the Southern District of West

7    Virginia Federal Court, Stoler versus PennyMac Loan

8    Services, Civil Action 2:18-cv-00988.

9               Would you please state your name for the

10   record?

11        A.    Karen Scott.

12        Q.    Is that with a K?

13        A.    Yes, it is.

14        Q.    And, Ms. Scott, have you had your deposition

15   taken before?

16        A.    Yes.

17        Q.    So I will skip the formalities at the

18   beginning, ground rules.  I will assume that you

19   understand those.

20              Are you taking any medications or having any

21   physical issues that would affect your testimony today?

22        A.    No.

23        Q.    Where do you live?

24        A.    I personally live in Seminole, Florida.

1        Q.    And where do you work?

2        A.    PennyMac Loan Services.

3        Q.    And what's your job title?

4        A.    Supervisor foreclosure operations.

5        Q.    How long have you been in that position?

6        A.    A little over five years.

7        Q.    And did you have a different position five

8    years before with PennyMac?

9        A.    No, I've been with PennyMac a little over five

10   years.

11       Q.    And what did you do before that?

12       A.    Before that, I worked for a law office for a

13   period of time.

14       Q.    What law office is that?

15       A.    Ronald R. Wolfe & Associates.

16       Q.    How do you spell Wolfe?

17       A.    W-o-l-f-e.

18       Q.    And where was that office located?

19       A.    Tampa, Florida.

20       Q.    And what was the time period in which you

21   worked for Wolfe & Associates?

22       A.    I worked for them a little over a year.  Their

23   office is closed now.

24       Q.    Okay.

1        A.    They merged with another firm.

2        Q.    And so is that 2013-2014?

3        A.    2013 to 2014.

4        Q.    And what did you do before that?

5        A.    Before that?

6        Q.    Yes, ma'am.

7        A.    I was a contractor.  I worked in the Bank of

8   America shops.  I was a contractor for the independent

9   foreclosure review that the eight largest banks in the

10  country had to undergo.  I was actually a contractor for

11  Bank of America, so I was not employed directly for

12  them.

13       Q.    And how long did you do that?

14       A.    The project lasted a little less than a year.

15       Q.    Okay.

16       A.    For Bank of America.  The project, the

17  nationwide project lasted longer than that, but Bank of

18  America settled.

19       Q.    What's your education background?

20       A.    Some college.

21       Q.    Where at?

22       A.    St. Pete College in Florida.

23       Q.    And what type of classes did you take there?

24       A.    Mostly real estate law.

1      Q.   And are you from the Tampa/St. Pete area

2   originally?

3      A.   No, I am from Western Pennsylvania originally.

4      Q.   Where in Western Pennsylvania?

5      A.   North of Pittsburgh.

6      Q.   What's the town?

7      A.   Zelienople.

8      Q.   Zelienople.

9      A.   But that was many, many, many, many years ago.

10     Q.   And before you worked for Bank of America, the

11  contracting for the foreclosure review for Bank of

12  America, what did you do?

13     A.   I was also still in mortgage default, Quantum

14  Servicing in Tampa, Florida.

15     Q.   How long did you do that?

16     A.   Two and a half years.

17     Q.   When did you first get into mortgage?

18     A.   That might be the easier question.  1982.

19     Q.   And who was that with?

20     A.   Oh, my goodness.  Fortune.  They're no longer

21  in business, Fortune Mortgage.

22     Q.   Have you seen the deposition notice that was

23  filed for which you're appearing today?

24     A.   Yes, I did.

1      Q.   And do you believe that you're a person with

2   sufficient knowledge to address the issues that were

3   identified in that deposition notice?

4      A.   I do.

5      Q.   Okay.

6           MR. CROWLEY:  The only issue, this witness is

7   not being produced with regard to the financial status,

8   with that objection.

9      Q.   Why don't you tell me what your job duties are

10   as supervisor of foreclosure operations.

11      A.   I review loans that are in default.  I review

12   them for accuracy in policy and procedures, make

13   recommendations for moving forward or not moving

14   forward.  I appear in depositions, trials, hearings,

15   mediations regarding those defaulted loans.

16      Q.   And where is the PennyMac, where is your

17   office with PennyMac?

18      A.   The main office is in California.  The office

19   that I work out of when I'm not traveling is in Tampa,

20   Florida.

21      Q.   Where do you live?

22      A.   In Seminole, Florida.

23      Q.   That's right, Seminole.  Okay.  How far is

24   that from Tampa?

1        A.    Like 27 miles door-to-door.

2        Q.    Is it to the north?

3        A.    It is toward the northeast.  Are you familiar

4   with Florida?

5        Q.    I am.  I'm actually going to be in Tampa

6   Sunday.

7        A.    I am between St. Petersburg and Clearwater.

8        Q.    Okay.

9        A.    On the Gulf Coast side.

10        Q.    All right.  So you're a supervisor of

11   foreclosure operations.  Are you one of several

12   supervisors, or are you the only supervisor?

13        A.    One of several supervisors.

14        Q.    And is that foreclosure operations team or

15   division, is it all located there in the Tampa office?

16        A.    No, it is not.

17        Q.    So it's several offices around the country?

18        A.    There are several offices around the country.

19   The appearance team who does what I do, we are all in

20   Florida, we are not all in Tampa.

21        Q.    About how many people are in the appearance

22   team?

23        A.    Three are the main appearance team.  We can

24   call upon others as needed.

1      Q.   And is that, that name, does that come from

2   the fact that part of your job duties are appearing in

3   litigation?

4      A.   Correct.

5      Q.   Do you have a guess, approximation of how many

6   depositions you've attended in this position?

7      A.   A couple dozen.

8      Q.   Do you directly supervise the division as part

9   of your job description?

10      A.   I do not.

11      Q.   All right.  What did you do to prepare for

12   this deposition?

13          MR. CROWLEY:  I instruct you not to disclose

14   any communication we've had.  You can disclose that they

15   took place, not the communications.

16      A.   I did review the loan, all the communications,

17   the notes, the payment histories, the collateral file,

18   which is the original note, the mortgage, title, policy,

19   that type of things, all business records that we have

20   imaged and all system, system records.

21      Q.   As part of your, I'm jumping back here, but

22   part of your job duties when you worked for the

23   contractor that did foreclosure review for Bank of

24   America, did you review foreclosure practices of Bank of

1   America's relating to Rural Housing Service guaranteed

2   loans?

3        A.   I couldn't tell you for sure if any of them

4   were Rural Housing, but they were all of Bank of

5   America's foreclosures.  It was part of the independent

6   foreclosure review ––

7        Q.   Yeah.

8        A.   –– if you knew what that was about.  I

9   couldn't tell you for sure.

10        Q.   And you understand that Ms. Stoler's loan is

11   guaranteed by the U.S. Department of Agriculture Rural

12   Housing Service?

13        A.   Yes.

14        Q.   And you're familiar with the loss mitigation

15   and foreclosure policies that are attended to that type

16   of loan, guaranteed loan?

17        A.   Yes.

18        Q.   Did you participate in the preparation of the

19   document production and discovery responses in this

20   case?

21        A.   Personally, I did not.

22        Q.   Generally speaking –– well, actually, let's

23   just talk specifically about this case.  In Ms. Stoler's

24   case, how many employees of PennyMac will be involved in

1   the litigation in addition to yourself?

2            MR. CROWLEY:  Object to the form.  You can

3   answer.

4       A.   How many, I couldn't say how many would

5   actually be involved.

6       Q.   Okay.  All right.

7            (Deposition Exhibit No. 1 marked for

8            identification.)

9       Q.   I'm handing you what's been marked as

10  Deposition Exhibit No. 1.  Could you identify this

11  document, please?

12      A.   This appears to be our servicing notes.

13      Q.   And it indicates that on the front page that

14  this is the communication notes up through January 31st,

15  2018; is that correct?

16      A.   That's what it shows, yes.

17      Q.   Is there maintained by PennyMac a

18  communication notes history that would include any

19  communication notes from January 31st, 2018, to the

20  present?

21      A.   There are notes that show everything from when

22  we took on the servicing through today.

23      Q.   And have you reviewed those communication

24  notes, specifically those that exist, if any, between

 1    January 31st, 2018, and up to today?

 2        A.    Yes.

 3            MR. POMPONIO:  Are those something that is

 4    going to be produced or ...?

 5            MR. CROWLEY:  I'll have to review them.  I

 6    thought they had been produced.  Obviously, if you're

 7    saying they're not, I'll take your word for it.

 8            MR. POMPONIO:  I just didn't see them.  I

 9    suppose they could have ——

10    BY MR. POMPONIO:

11        Q.    Did you review the document production prior

12    to the deposition today?

13        A.    Are you referring to the 2,000 page ——

14        Q.    The 1583.

15        A.    Yes.

16        Q.    Do you recall whether or not you saw any of

17    the communication notes from January 31st up to —— the

18    document production was in April, so I would imagine it

19    would be ——

20        A.    I do not recall seeing any.

21            MR. CROWLEY:  I'll confirm on that and follow-

22    up with you on that.

23            MR. POMPONIO:  Okay.  And I probably —— it

24    probably won't be necessary to come back and ask any

 1   questions about that, but that's some important

 2   information that we need for the contacts —

 3            MR. CROWLEY:  I understand.  Let me get that

 4   to you.  You know, as I said, I'll confirm whether they

 5   were in the package or not, and if not, I'll get them to

 6   you and we can discuss whether there's any need to do

 7   anything at that point.

 8            MR. POMPONIO:  Okay.

 9   BY MR. POMPONIO:

10       Q.   With respect to Deposition Exhibit No. 1, is

11   this document intended to contain all notes of

12   communications with a borrower?

13       A.   Could you repeat that?

14       Q.   Is this Deposition Exhibit 1 intended to

15   contain all notes of all communications that PennyMac

16   has with the borrower?

17       A.   Yes.

18       Q.   And it includes both written communications,

19   notes of written communications and telephone?

20       A.   This does not indicate every written

21   communication.

22       Q.   How do they decide what written communications

23   are referenced in this document and which written

24   communications are not?

1      A.    This is servicing notes.  It is not a letter

2   log.  Basically, I mean, they are two different

3   documents.  The letters are not necessarily indicated in

4   here unless somebody specifically enters that.

5      Q.    And is there any way to discern from this

6   Deposition Exhibit No. 1 who the individual is, employee

7   of PennyMac I presume, that would be entering this

8   information into the history?

9      A.    On this document, it does not indicate.  On

10  the servicing notes, it does indicate the department,

11  the date, who put it -- and who put it out there.

12     Q.    But when you were reviewing that document

13  production, do you recall seeing that, the servicing

14  notes in there?

15     A.    I do not.

16          MR. POMPONIO:  Let's check on that as well --

17          MR. CROWLEY:  Yes.

18          MR. POMPONIO:  -- please.

19          MR. CROWLEY:  Uh-huh.

20  BY MR. POMPONIO:

21     Q.    All right.  You can set that aside.

22              (Deposition Exhibit No. 2 marked for

23               identification.)

24     Q.    I'm handing you what's been marked as

1    Deposition Exhibit No. 2.  Could you identify this,

2    please?

3         A.    These three pages are a corporate advance

4    history.

5         Q.    Could you explain what a corporate advance

6    history is?

7         A.    A corporate advance is any advances that are

8    done on a particular loan that are not escrow

9    disbursements.

10        Q.    And it appears to me from this exhibit that

11   all of the corporate advances that are listed here are

12   property inspection fees to Safeguard; is that correct?

13        A.    That is correct.

14        Q.    If you turn to the second page.  The second

15   entry in this log has a transaction amount minus $36.

16   What is that supposed to represent?

17        A.    That would represent funds coming in.  The

18   transaction code on the immediate left-hand side shows

19   745, so that tells me that is funds coming in or a

20   credit being made.

21        Q.    And so where would those funds come from,

22   would they come from the borrower payments?

23        A.    You would need to refer to the payment history

24   in order to find out if it was part of a payment coming

1    in or how those funds came to be.

2         Q.   And do you know under what circumstances

3    Ms. Stoler would be required to pay these corporate

4    advances that are listed on Deposition Exhibit 2?

5         A.   On what circumstances?

6         Q.   Under what circumstances, right.

7         A.   I'm not sure I know what you mean.

8         Q.   Do you know how it would come to be that

9    Ms. Stoler would have to pay these charges that are

10   listed on this exhibit?

11        A.   I'm still not clear.

12             MR. CROWLEY:  Are you asking why they were

13   charged to the account?

14        Q.   I'm asking if she paid them and under, and how

15   would that, how would they be collected from her, that

16   kind of thing.

17        A.   They would be included in a payoff.  These are

18   property inspections that, as per the mortgage, that we

19   are permitted to charge and to actually make a physical

20   inspection, and it also is an investor requirement that,

21   once a loan is in default, that a monthly property

22   inspection be completed.

23        Q.   Does PennyMac maintain those invoices from

24   Safeguard wherein these charges appear?

1        A.    Yes.

2        Q.    So your testimony is that these charges are

3    recoverable from Ms. Stoler; correct?

4        A.    Correct.

5        Q.    And do you know, having reviewed this file,

6    whether she, in fact, paid some of these charges?

7        A.    Without actually reviewing the history on the

8    particular dates that you pointed out, I cannot tell

9    where those funds came from.  So, you know, without

10   looking at the payment history, I couldn't tell you.

11       Q.    But you did review the payment history prior

12   to this —

13       A.    Yes.

14       Q.    — correct?  But you just, you don't recall —

15       A.    Well, I didn't zoom in on that date.

16       Q.    Right, right.  Are these charges recoverable

17   from the investor, as well?

18       A.    It certainly would depend on the circumstances

19   and disposition of this loan.

20       Q.    So in certain circumstances they would be;

21   correct?

22       A.    Correct.

23       Q.    Do you know whether PennyMac has sought to

24   recover any advances or reimbursement or anything with

1    respect to Ms. Stoler's loan from the investor?

2         A.   Any such claim or request for advances would

3    take place after the disposition of this loan.  Right

4    now it's still an active loan, so there wouldn't have

5    been.

6              (Deposition Exhibit No. 3 marked for

7              identification.)

8         Q.   Okay.  All right.  I'll hand you what's been

9    marked as Deposition Exhibit No. 3.  Can you identify

10   this document, please?

11        A.   This is correspondence sent December 21st,

12   2017, discussing that the borrower had contacted our

13   office to start a loss mitigation or a modification

14   application.

15        Q.   And it invites Ms. Stoler to provide certain

16   information so that the application may be reviewed; is

17   that correct?

18        A.   That is correct.

19        Q.   And that information is included in sort of

20   the center of the page there, those bullet points?

21        A.   That's correct.

22        Q.   And is it your understanding that the forms

23   that are necessary for Ms. Stoler to provide the

24   information that PennyMac requests are included in this

1    packet?  I mean, I don't have — the exhibit doesn't

2    have it, but generally speaking, would those enclosures

3    come with this letter?

4          A.    Generally speaking, yes.

5          Q.    And at the top right, it says that Ms. Stoler

6    is directed to respond to this by January 20th, 2018; is

7    that correct?

8          A.    That's correct.

9          Q.    Where does that time frame come from, that

10   deadline to respond to this sort of welcome letter, is

11   that what you call, would call this, or what would you

12   call this letter?

13         A.    Loss mitigation letter.  And the time, the

14   date would have come from 30 days out.  Thirty days

15   would have been given.

16         Q.    Now, you're familiar with the Rural Housing

17   Service loss mitigation foreclosure policies; correct?

18         A.    Correct.

19         Q.    And is it your understanding that there's a

20   policy that a loan modification, loss mitigation request

21   cannot be reviewed by PennyMac if it's less than 37 days

22   prior to the foreclosure sale date?

23         A.    That is correct.

24         Q.    And what is the date that a loss mitigation

 1    request is considered made by a borrower?  You know,

 2    what is —— you know, this loss mitigation letter is

 3    referencing a previous telephone communication, right,

 4    in which Ms. Stoler has requested loss mitigation; is

 5    that right?

 6         A.    That's what it appears, yes.

 7         Q.    And so she called in sometime prior to

 8    December 21st requesting loss mitigation assistance.

 9    What I'm trying to figure out is when is that —— with

10    respect to that 37 days, when did they consider the

11    request having been made?  Do you follow me?

12         A.    I don't.

13         Q.    You can't review loss mitigation requests

14    prior, 37 days or less prior to the sale.  What is

15    considered the request for loss mitigation?

16         A.    In this particular case, the borrower called

17    in and indicated that she would like to explore her

18    options as far as loss mitigation, or loan modification.

19    That was December —— prior to December 21st, we

20    acknowledged with a letter.  It does state below here

21    that, you know, the —— it does discuss the 37 days prior

22    to the scheduled sale date.  At this point when this

23    letter was originated, there was no sale date yet.

24         Q.    So back to my question, which I'm not asking

1    very artfully, but is it the completed application that

2    they can't review, you know, after the 37-days deadline?

3    Is that what ——

4            I mean, what I'm getting at here is sometime

5    in December, before December 21st, she called and made a

6    request, then PennyMac sent out this loss mitigation

7    letter.  This is all prior to the foreclosure sale.  And

8    so is it not the case that her loss mitigation request

9    came in prior to that 37 days?

10           MR. CROWLEY:  Objection to form.  You may

11   answer.

12       A.   Well, again, in this particular case, the sale

13   had, was not out there, so there wouldn't have been any

14   flags on that date that said that we couldn't follow-up

15   for the additional information that is needed in order

16   to obtain a complete package.  And then once we receive

17   the complete package, then it needs to be reviewed from

18   that point.

19       Q.   You are aware, are you not, that Ms. Stoler

20   filed an application pursuant to this letter in January

21   8th, I think, was the date, and that was ultimately

22   denied because it was, the request was made within 37

23   days of the sale?

24       A.   Are you talking about January 2018?

1      Q.    That's correct.

2      A.    Yes, I am aware of that correspondence.

3      Q.    And so I'm trying to understand, was the

4   request not made actually prior to the 37 days or do

5   they not consider it a request until they have a

6   completed application?

7      A.    Once — if even if the borrower were to

8   request the paperwork to start the loan modification

9   request or the package, even if she had requested it

10  prior and then sent the information in, it would have

11  been within the 37 days at that point.

12          This one in particular, this December 21st, we

13  didn't know there was a foreclosure sale set, so at that

14  point we were thinking we were going to have the time to

15  gather all the information, review it, and make a

16  decision.  But it turns out that the sale was set and,

17  therefore, this could not happen.

18     Q.    Is there any policy in the RHS procedure

19  manual, guidance, whatever, that speaks to setting a

20  foreclosure sale after a request has been made for loss

21  mitigation?

22     A.    I thought he was going to speak.

23          The guidelines state that once there is a

24  completed package, that's when there would be a

1  decision.  The waterfall would be completed, the

2  decision would be made.  The policy states that if we

3  have all the documents in prior, that we could certainly

4  look at it if it wasn't within that 37 days.  Is that

5  what you're asking me?

6       Q.   No, I'm asking you ⸺

7       A.   Okay.

8       Q.   ⸺ is there any policy relating to whether or

9  not PennyMac should set a foreclosure sale after a

10  request for loss mitigation is received?

11       A.   No.  The guidelines state that the loss

12  mitigation, the foreclosure sale date will continue and

13  the foreclosure process continues.  Unless we have a

14  completed package and it's been reviewed and it has been

15  determined that we're going to modify, then everything

16  is put on hold.  But if there's not a completed package

17  and a review that states that the borrower qualifies,

18  there would be no reason to stop the foreclosure process

19  at that point.

20       Q.   So your testimony is, is that the RHS loss

21  mitigation policies provide that you dual track while

22  there's a loss mitigation review and the foreclosure's

23  only stopped when, when the borrower's approved for?

24            MR. CROWLEY:  Objection, that's not what was

1    said.

2         A.   No, when a complete package is in and is

3    reviewed and determined that there is --

4         Q.   So that's --

5         A.   -- a possibility.

6         Q.   So my characterization is correct?

7         A.   Could you repeat your characterization then?

8         Q.   It's the RHS policy that, that the loss

9    mitigation and the foreclosure dual track until such

10   time as a borrower is approved for some loss mitigation?

11        A.   When a complete package is in.

12        Q.   Okay.  All right.  Are you generally familiar

13   with sort of the history of Ms. Stoler's account?

14        A.   I am.

15        Q.   And is it fair to say that, that she had some,

16   well, that she was married when she first entered into

17   this loan, is that your understanding?

18        A.   It was.

19        Q.   And she was subsequently divorced during the

20   time that PennyMac was servicing this loan.  And

21   Ms. Stoler initially, in 2016, made a request for loss

22   mitigation in which she referenced a change in income

23   due to her divorce; is that correct?

24        A.   Yes.

1        Q.    And was it your understanding that that, that

2   request was denied?

3        A.    Yes.

4        Q.    And what was the reason why that request was

5   denied?

6        A.    Without having that correspondence in front of

7   me --

8        Q.    It doesn't matter.  If you don't recall --

9   it's just background.  It's not -- I'm not -- that's not

10   a big part of what I'm trying to figure out.

11             And so after that, after that denial, she had

12   some different changes in her income unrelated to the

13   divorce, is that your understanding?

14        A.    It is.

15        Q.    And so she was ultimately approved for a

16   forbearance attended to her unemployment; correct?

17        A.    Correct.

18        Q.    Now, what's your understanding of the purpose

19   of a forbearance?

20        A.    This particular forbearance was to help with

21   the payments during the unemployment, during the time

22   that she is unemployed, and then she is to keep in

23   touch, let us know when she does obtain employment, and

24   then, you know, things could be reevaluated to see, you

1   know, what else can be done.

2        Q.   And so the term "forbearance " means that

3   PennyMac is going to not foreclose, forbear from

4   enforcing, accelerating, and foreclosing during that

5   period; correct?

6        A.   Correct.

7        Q.   And the reason that that program is selected

8   is because Ms. Stoler didn't have the income to make her

9   payments; is that correct?

10        A.   Correct.

11        Q.   Now, are there different terms to forbearance

12   agreements in a RHS guaranteed loan program?

13        A.   There are a couple of different terms.

14        Q.   What are those different terms?

15        A.   Payment plan, forbearance plan.

16        Q.   I'm sorry.

17        A.   Okay.

18        Q.   What I meant was, in terms of duration, length

19   of the forbearance, are there different -- Ms. Stoler

20   got six months.  Is there a year, is there three months,

21   is there different lengths of forbearance?

22        A.   There are different lengths.  There are

23   shorter lengths of period of time.  It is determined on

24   the need.  That was why it was important to stay in

1    contact, to let us know when she obtained employment.

2          Q.    And does PennyMac generally communicate to

3    their borrowers that they should communicate, you know,

4    contact PennyMac when they have found employment?  Is

5    that something that's made, a point that's important?

6          A.    Yes.

7          Q.    And when PennyMac offered the forbearance to

8    Ms. Stoler, they obviously understood that she was

9    receiving unemployment income; correct?

10         A.    Yes, yes.

11         Q.    And is the payment amount that, that was

12   provided in that agreement based on her unemployment

13   income?

14         A.    It was based on many factors.  Again, there is

15   a forbearance waterfall.  Rural Housing has a specific

16   waterfall that is to be adhered to.

17         Q.    What other factors, in addition to the income,

18   go into, expenses, household expenses, stuff like that?

19         A.    Yes.

20         Q.    With respect to the duration of the

21   forbearance -- in this case, in Ms. Stoler's case it was

22   six months -- what factors go into how PennyMac decides

23   what the length of that forbearance ought to be?

24         A.    Again, it is based on RHS and their waterfall

 1    and their recommendations, so it is their decision on

 2    the duration.

 3         Q.   So tell me a little bit more about that.  When

 4    a borrower -- well, when PennyMac receives a completed

 5    application for loss mitigation, the ultimate -- well,

 6    who makes the decision on what, or if any, loss

 7    mitigation that borrower is approved for, who makes that

 8    decision?  And in this case, Ms. Stoler got a

 9    forbearance agreement.  Who made that decision that this

10    is the forbearance agreement that she's approved for?

11         A.   That would be the Rural Housing and their

12    specifications.

13         Q.   So there's an employee of Rural Housing

14    Service that approves these?

15         A.   No, PennyMac is the servicer, but they adhere

16    to all the investor guidelines and RHS guidelines.

17         Q.   So the decision's made by PennyMac based on

18    guidelines promulgated by Rural Housing Service?

19         A.   Yes.

20         Q.   And do you have a computer program or

21    something to plug all this information in and then it

22    gives you the alternatives that the borrower is eligible

23    for?

24         A.   Yes, that's the waterfall that we're

 1    discussing.

 2         Q.   And that waterfall, what is the --

 3    logistically speaking, is it some software that is on

 4    the computer that the PennyMac employee accesses?  How

 5    do they ...?

 6         A.   That would be it.

 7         Q.   Do you know the name of that software program?

 8         A.   I do not.

 9         Q.   Have you ever interfaced with that, entered

10    information?

11         A.   Not for PennyMac, no.

12         Q.   For anybody?

13         A.   Yes.

14         Q.   And this would be the Rural Housing Service?

15         A.   Not necessarily.

16         Q.   Now, is the Rural Housing Service waterfall

17    proprietary to Rural Housing Service, is that a special

18    software that you use?

19              MR. CROWLEY:  Objection to form.  You can

20    answer.

21         A.   Are you asking if it is a particular software

22    that is only for Rural Housing?

23         Q.   Correct.

24         A.   No.

1     Q.   Okay.  All right.  Now, in this case the

2  forbearance was approved for six months.  That was what

3  the length of it was; correct?

4     A.   Correct.

5     Q.   And was there any consideration in that length

6  of forbearance, the time in which Ms. Stoler was

7  expected to continue to receive unemployment benefits?

8     A.   Could you rephrase that?

9     Q.   Did PennyMac consider in setting up this

10 forbearance agreement the fact that Ms. Stoler's

11 unemployment benefits would end four months into the

12 forbearance agreement?

13    A.   I couldn't answer that.

14    Q.   Do you know whether or not the length of time

15 that a borrower is anticipating receiving unemployment

16 benefits factors into the forbearance agreements, those

17 at least forbearance that are due to unemployment

18 agreements, at all?

19    A.   I'm not sure what you're asking in particular.

20 Could you be more specific?

21    Q.   Does the waterfall take into consideration how

22 long the borrower is going to receive unemployment

23 benefits?

24    A.   I couldn't answer that.

1          Q.    How would this forbearance agreement have

2    worked had Ms. Stoler been able to make all six

3    payments?  What would happen at the end of that period?

4          A.    At the end of that period, it would have

5    also — we would have had to know if she got a job, and

6    that information would have to, then, be considered for

7    a permanent modification if she qualified for such.

8          Q.    So what's anticipated here in this instance of

9    Ms. Stoler's forbearance agreement is, is that at the

10   end of the forbearance period, assuming she made all the

11   payments, she would be considered for a loan

12   modification?

13         A.    As long as she qualified.

14         Q.    Right.

15         A.    Yes.

16         Q.    She'd be considered for it.  I'm not saying

17   that she would be entitled to it, but she would, that's

18   what they contemplate.

19         A.    Correct.

20         Q.    And would you expect that that, that that

21   process and that expectation would have been

22   communicated to Ms. Stoler at the time that this was

23   offered?

24              MR. CROWLEY:  Are you asking if she knows

1    whether it was?  I'm going to object to the form.

2         A.    Is that what you're asking, if I knew?

3         Q.    No, I'm asking you if that expectation that

4    the -- whether it by practice and policy at PennyMac, is

5    that information communicated to the borrower, in this

6    case Ms. Stoler?

7         A.    Her options would have been, yes, would have

8    been disclosed.

9         Q.    I'm going to hand you a copy of what was

10   marked Deposition Exhibit No. 6 in Ms. Stoler's

11   deposition this morning.  And this is the

12   memorialization of the forbearance agreement for which

13   she was qualified, approved; correct?

14        A.    It is a letter outlining the forbearance time

15   frames.

16        Q.    And at the bottom of the -- towards the bottom

17   there's a box.  There's two boxes.  The second to the

18   last box, it states in there about what the expectations

19   are at the conclusion of the forbearance agreement; is

20   that correct?

21        A.    It does.

22        Q.    It doesn't say anything about a loan

23   modification application or anything like that, does it?

24        A.    It does not.

1          Q.    Would it be the case that, if Ms. Stoler had

2     completed this, all the payments in this forbearance

3     agreement, that at the conclusion of it in January 2018

4     she would resume making her regular monthly payment?

5          A.    That's what is stated here, yes.

6          Q.    But is that, indeed, what is expected to

7     happen?

8          A.    This is a forbearance plan.  The forbearance

9     plan is not based on any loss mitigation package that

10    would have been sent in.  The forbearance plan is based

11    solely on the hardship and the unemployment.  So there

12    wasn't a package completed in order to have been given

13    the forbearance.  Does that make sense?

14         Q.    Do you recall, having reviewed the documents

15    in preparation for this deposition, that Ms. Stoler sent

16    in a loss mitigation packet in June of 2017 in which she

17    was requesting a loan modification and she got the

18    forbearance agreement, correct, isn't that your

19    recollection of the events?

20         A.    My recollection is that the mod was denied,

21    and I do not recall the reason.  This forbearance plan

22    is based on the —— it's not based on a loan modification

23    package that was approved.  It is based on the

24    unemployment and the, you know, the fact that at the end

1    of this she would resume her normal payments or she

2    could, at her option, if she qualified, send in a

3    package, and if she qualified, it could have been

4    modified.

5          Q.   So if she had made —— I just want to

6    understand this.  If she had made all six of these

7    payments timely, then starting in January her loan would

8    be current and she would just start making payments?

9          A.   She wasn't making full payments here.

10         Q.   Correct.

11         A.   These were only partial payments.

12         Q.   And she had an arrearage, as well; correct?

13         A.   Correct.

14         Q.   So would she have, in January, started making

15   her regular monthly payments?

16         A.   If she was able to.

17         Q.   So would the loan have been brought current at

18   that time or what —— I don't understand what happens

19   there.  It seems to me like that disclosure is

20   applicable to a forbearance agreement that is more like

21   a repayment plan in which the arrearage would be cured

22   at the conclusion of the forbearance agreement.  Isn't

23   that —— is that your understanding?

24         A.   Well, that is not what's stated here at all.

1      Q.    In your experience as a supervisor of

2   foreclosure operations, are you familiar with any case

3   in which PennyMac offered a forbearance unemployment

4   agreement that was, where the payment amount was not

5   sufficient to cure the arrearage, it's not a repayment

6   plan, and that at the conclusion of that they just

7   brought the loan current and allowed the borrower to

8   start making their monthly payments?

9      A.    That would be a different type of plan.

10  That's not just forbearing for a period of six months

11  until she has a job and then she can bring the loan

12  current.

13     Q.    Okay.

14     A.    Which is what this appears to be, that it was

15  a forbearance to help her get back on her feet, get her

16  a — once she obtains a position, a full-time paying

17  position, then, of course, she could then, she always

18  has the option to, you know, request a modification at

19  that point.  This is not that.  This is clearly nothing

20  more than forbearing while she is unemployed, because

21  the payments, they were only half payments, they weren't

22  even half of a payment there.

23     Q.    Right, right.  Okay.  Does PennyMac record

24  their phone calls with borrowers?

1      A.    Yes.

2      Q.    And do they maintain those?

3      A.    Yes.

4      Q.    How long do they hold on to those, do you

5   know?

6      A.    I couldn't answer how long.

7      Q.    Does RHS, the Rural Housing Service, ever

8   conduct audits of PennyMac's servicing of RHS guaranteed

9   loans?

10      A.    Yes.

11      Q.    Are you familiar with the last time they were,

12   there was such an audit?

13      A.    No, I'm not.

14      Q.    Do you know what, what that type of audit

15   would entail?

16          MR. CROWLEY:  I'm going to object.  This is

17   beyond the scope the 30(b)(6).  To the extent the

18   witness testifies, she's testifying from personal

19   knowledge, not as a designated ... But you may answer,

20   if you can.

21      A.    I don't know what their audit would entail.

22      Q.    Do you know if PennyMac or the investor or

23   anybody conducts sort of a foreclosure review similar to

24   the type of foreclosure you did for the independent

1    foreclosure review of PennyMac's RHS guaranteed loans?

2              MR. CROWLEY:  Same objection.  You may answer.

3         A.   I do know that reports, monthly reports would

4    go to every one of the RHS or FHA or VA, that type of

5    thing.  There are monthly reports that are sent to them

6    on each loan.

7         Q.   Is that the extent of it, to your knowledge,

8    of any foreclosure review of PennyMac RHS, servicing of

9    RHS guaranteed loans?

10        A.   For RHS reviewing them, yes, that's the only

11   thing that I would know.

12        Q.   Is there any reason why Ms. Stoler could not

13   be considered for a, some loss mitigation or loan

14   modification currently?

15        A.   There's no reason why she couldn't, no.

16        Q.   I think that's all I have.

17             MR. CROWLEY:  I have just a couple follow-up.

18                       EXAMINATION

19   BY MR. CROWLEY:

20        Q.   With regard to the discussions about the RHS

21   waterfall, the software package that you discussed, to

22   your understanding, does that software package

23   incorporate RHS requirements?

24        A.   It is a program that does, yeah, incorporate

1    RHS requirements.

2         Q.   And is it, then, PennyMac's role to input the

3    data provided by the borrower?

4         A.   That is correct.

5         Q.   And does the program then advise PennyMac as

6    to what options the borrower's eligible for under the

7    RHS program?

8         A.   It does.  Inputting the information then

9    creates the waterfall, which then tells you what the

10   options are for that particular borrower with that

11   particular income and so forth.

12        Q.   Under the RHS regulations, does PennyMac have

13   the ability to change the decisions made by that

14   waterfall?

15        A.   No.

16        Q.   With regard to the discussions earlier about

17   complete packages and double tracking and stuff like

18   that, at the time that this — I forget — which exhibit

19   was this?  This is the December 21st, 2017.  Was that

20   Exhibit 1?

21             MR. POMPONIO:  3.

22             MR. CROWLEY:  Exhibit 3, okay.

23   BY MR. CROWLEY:

24        Q.   At the time that Exhibit 3 was issued on

1   December 21st, 2017, is it your understanding that all

2   that occurred at that point was that there was a

3   telephonic request for a loan mod?

4        A.   Yes.

5        Q.   Is the telephone, a telephonic request for a

6   loan mod considered a complete application?

7        A.   Oh, no.

8        Q.   Is it considered an application?

9        A.   It is not.

10       Q.   When after the date of December 21st, 2017, is

11  your understanding based on the records of when a

12  complete application finally was submitted?

13       A.   I don't recall seeing a complete application

14  letter.

15       Q.   Okay.

16       A.   So I don't recall — or I couldn't say if a

17  complete package was even received.

18       Q.   Well, let me rephrase it a different way,

19  then.

20       A.   Okay.

21       Q.   Counsel earlier referred to an application

22  that was sent or received on January 8th of 2018.  Do

23  you recall that?

24       A.   Yes.

1      Q.   Is it your understanding that that was the

2    first time after this letter of December 21st, 2017,

3    that PennyMac actually received a written application

4    from Ms. Stoler, regardless of whether it was complete?

5      A.   That's correct.

6      Q.   Is it your understanding that it is the

7    complete application that triggers the stop on any

8    further foreclosure activity?

9      A.   Yes.

10      Q.   Okay.  Thank you.  I have nothing further.

11                        EXAMINATION

12   BY MR. POMPONIO:

13      Q.   I just have a couple more questions.  First is

14   that last response you provided.  My understanding was

15   that you stated in earlier testimony that a foreclosure

16   is not stopped upon receipt of a completed application

17   but rather only if that application is approved for some

18   sort of loss mitigation that would require the

19   foreclosure to be taken off.  Wasn't that your

20   testimony?

21      A.   The moving forward with a foreclosure, that

22   part is stopped on a completed application.  The

23   foreclosure, setting a foreclosure sale, that part is

24   stopped once they are approved.

1         Q.    I don't understand.  What is stopped upon

2    receipt of a completed application?

3         A.    A completed application, the foreclosure.

4         Q.    When you say — what do you mean?

5         A.    A completed application, which means we've got

6    everything in that we need in order to complete the

7    waterfall so a determination can be made.  We put the

8    foreclosure on hold at that point.  Now, if a sale is

9    already set, then the foreclosure sale itself — I mean,

10   maybe that's what we, we differed on.

11        Q.    So if a completed application is received and

12   there is a foreclosure sale set, that stays until the

13   borrower's approved; is that correct?  What in the

14   foreclosure is stopped?

15        A.    See, it's all — the timing here, that's why

16   they don't accept it within the 37 days prior to

17   foreclosure sale.  Not just — if it's just in general

18   foreclosure and no sale has been set, a completed

19   application, we would ask the foreclosure to be put on

20   hold, okay?  Not a closing bill, but a hold until we see

21   what the outcome is.  If there's already a sale set,

22   that's when that 37 days, you know, kicks in.

23        Q.    Are you familiar with the loss mitigation

24   program referred to as partial claim?

1      A.   Yes.

2      Q.   Is a partial claim type of program available

3  in a RHS guaranteed loan?

4      A.   I would have to check on that.  You're talking

5  about a partial claim where RHS either forgives a

6  portion of debt or in some cases create a note, a

7  separate note for the arrearages so that they start out

8  clean and fresh.  Is that what you're referring to?

9      Q.   Right.  Basically take the arrearage and you

10  either forgive all or some of it and the rest is put in

11  a second note, deed of trust and —

12      A.   I would have to check to see if RHS would

13  offer that option.

14      Q.   That's all I have.

15          MR. CROWLEY:  Okay.  I have nothing further.

16              (The deposition of KAREN SCOTT concluded

17              at 2:40 p.m.)

18

19

20

21

22

23

24

1  STATE OF WEST VIRGINIA, To-wit:

2          I, Lisa M. Short, a Notary Public and

3  Certified Court Reporter within and for the State

4  aforesaid, duly commissioned and qualified, do hereby

5  certify that the deposition of KAREN SCOTT was duly

6  taken by me and before me at the time and place

7  specified in the caption hereof.

8          I certify that the attached transcript meets

9  the requirements set forth within Article 27, Chapter 47

10  of the West Virginia code.

11          I do further certify that said proceedings

12  were correctly taken by me in stenotype notes, that the

13  same were accurately transcribed out in full and true

14  record of the testimony given by said witness.

15          I further certify that I am neither attorney

16  or counsel for, nor related to or employed by, any of

17  the parties to the action in which these proceedings

18  were had, and further I am not a relative or employee of

19  any attorney or counsel employed by the parties hereto

20  or financially interested in the action.

21      My commission expires the 8th day of September
   2023.
22
       Given under my hand and seal this 7th day of August
23  2019.

24          _____
            Lisa M. Short, CCR
            Notary Public