# EXHIBIT D

Jessica Stoler                                                      August 5, 2019

## Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

==========

JESSICA A. STOLER,
    Plaintiff,

v.        CIVIL ACTION NO. 2:18-CV-00988

PENNYMAC LOAN SERVICES, LLC,
    Defendant.

==========

DEPOSITION OF JESSICA STOLER

Goodwin & Goodwin, PLLC
300 Summers Street
Charleston, West Virginia

August 5th, 2019
10:00 a.m. - 11:49 a.m.

_____

KRISTEN S. CRADDOCK, CCR
Sanford Reporting & Video, Inc.
P.O. Box 886
St. Albans, WV 25177
(304) 389-5562

## Page 2

APPEARANCES:

COUNSEL FOR PLAINTIFF:  Jessica A. Stoler

    Bren J. Pomponio, Esquire
    MOUNTAIN STATE JUSTICE, INC.
    2117 Quarrier Street
    Charleston, West Virginia 25301

COUNSEL FOR DEFENDANT:  PennyMac Loan Services, Inc.

    Francis X. Crowley, Esquire
    BLANK ROME, LLP
    130 North 18th Street
    Philadelphia, Pennsylvania 19103

    Carrie Goodwin Fenwick, Esquire
    GOODWIN & GOODWIN, PLLC
    300 Summers Street, Suite 1500
    Charleston, West Virginia 25064

## Page 3

EXAMINATION INDEX

| | |
|---|---|
| BY MR. CROWLEY | 5 |
| BY MR. POMPONIO | 60 |
| BY MR. CROWLEY | 67 |

## Page 4

EXHIBIT INDEX

| | | |
|---|---|---|
| 1 | Interrogatories | 8 |
| 2 | Series of Letters | 11 |
| 3 | Customer Certification | 15 |
| 4 | 4/7/17 Notice | 16 |
| 5 | Mortgage Assistance Application | 18 |
| 6 | 6/30/17 Notice | 22 |
| 7 | 12/5/17 Notice | 28 |
| 8 | Mortgage Assistance Application | 31 |
| 9 | 1/23/18 Notice | 39 |
| 10 | 1/3/18 Letter | 36 |
| 11 | 1/23/18 Letter | 45 |
| 12 | 1/25/18 Letter | 58 |
| 13 | 4/10/14 Notice | 59 |
| 14 | Deed of Trust | 59 |

Sanford Reporting & Video, Inc.         sanford@sanfordreporting.com

Jessica Stoler                                        August 5, 2019

Page 5

1            J E S S I C A   S T O L E R
2    after first being duly sworn, was examined and testified
3                    as follows:
4            E X A M I N A T I O N
5    BY MR. CROWLEY:
6        Q.  Good morning, Ms. Stoler.
7        A.  Good morning.
8        Q.  As we mentioned before, my name is Frank
9    Crowley, and I'm an attorney here representing PennyMac
10   -- specifically, PennyMac Loan Services, LLC -- in
11   connection with a lawsuit that you have brought against
12   PennyMac.  I'm going to ask you a number of questions
13   today that I believe relate to that lawsuit and what's
14   been alleged in the case.  And if at any time today you
15   do not understand my questions, for example, if I speak
16   too fast or if the question is confusing in any way,
17   will you please let me know so that I may rephrase?
18       A.  Sure.
19       Q.  Okay.  Many times we'll be able to understand
20   -- you'll be able to anticipate what I'm asking, but
21   please allow me to finish the question so that the court
22   reporter will be able to take down both the question and
23   the answer, okay?
24           By the same token, if you feel that I've cut

Page 6

1    you off from an answer either because I jumped in too
2    quick or whatever, please let me know so that I may give
3    you the opportunity to complete your answer, okay?
4        A.  Okay.
5        Q.  Because the transcript is being taken down by
6    the court reporter, we both need to have all of our
7    answers and questions orally so that -- the court
8    reporter can't take down a shrug or a nod or a shake of
9    the head.
10       A.  Okay.
11       Q.  Thank you.
12           Have you ever had a deposition taken before?
13       A.  No.
14           MR. CROWLEY:  Bren, will the witness
15   reserve the right to read and sign?
16           MR. POMPONIO:  Probably not.
17           MR. CROWLEY:  Okay.
18   BY MR. CROWLEY:
19       Q.  Is there --
20           Are you on any type of medication or anything
21   that would prevent you from accurately recalling what
22   has occurred in the past?
23       A.  No.
24       Q.  Okay.  Are you aware of any other physical or

Page 7

1    medical condition that would cause you to have
2    difficulty recalling the past?
3        A.  No.
4        Q.  A few moments before the deposition started --
5            MR. CROWLEY:  Just for the record, a few
6    moments before the deposition started, counsel and I
7    were speaking that there is no question as to the
8    authenticity of the note and deed of trust; is that
9    correct?
10           MR. POMPONIO:  That's correct.
11           MR. CROWLEY:  Okay.  So, therefore, we
12   have a stipulation as to the authenticity and,
13   therefore, we won't be asking questions necessarily
14   about those documents today, other than some general
15   questions.
16   BY MR. CROWLEY:
17       Q.  Ms. Stoler, is it accurate that you did obtain
18   a loan in the approximate amount of $109,693 in April of
19   2014?
20       A.  Yes.
21       Q.  And was that a mortgage -- was that secured by
22   a mortgage on your property?
23       A.  (No verbal response.)
24       Q.  Do you understand that to be a mortgage?

Page 8

1        A.  Yes.
2        Q.  Okay.  And what was the property on which the
3    mortgage was placed?
4        A.  2122 21st Street.
5        Q.  Okay.  And was that your home at the time?
6        A.  Yes.
7        Q.  Okay.  Was this a refinance or a purchase?
8        A.  Purchase.
9        Q.  Thank you.
10           And have you lived at that address the entire
11   time?
12       A.  Yes.
13           (Exhibit No. 1 was marked.)
14       Q.  Okay.  I'm going to show you a number of
15   documents today and I would ask that you take whatever
16   time is necessary for you to review the documents in
17   order for you to understand what they are, and then I
18   will ask you a number of questions about the documents.
19   And if when I ask a question and you feel you need some
20   additional time to review it, please let me know, okay?
21           Ms. Stoler, I've shown you what's been marked
22   as Exhibit 1 to your deposition, which is a document
23   labeled Plaintiff's Answers and Responses to Defendant's
24   First Set of Interrogatories and Request for Production

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                          August 5, 2019

---

Page 9

1    of Documents.
2         Do you see that?
3    A.  Yes.
4    Q.  Okay.  And take whatever time you need to
5    review that, but I'm going to refer you -- the first
6    question I have is I'm going to refer you to what would
7    be Page 26.  They are numbered through 25 and then
8    there's Page 26.
9         Is that your signature on that document?
10   A.  Yes.
11   Q.  Okay.  Do you recall reviewing this document
12   prior to signing what's labeled there as a verification?
13   Please take whatever time you need to review the
14   document.
15   A.  Okay.  Could you repeat that question again,
16   please?
17   Q.  Sure.  Now that you've had the opportunity to
18   review the document that's Exhibit No. 1 to your
19   deposition, the first 25 pages of it, do you recall
20   reviewing the responses and answers -- the responses
21   that are set forth in that document --
22   A.  Yes.
23   Q.  -- prior to signing the document or the
24   verification that's attached as the 26th page?

---

Page 10

1    A.  Yes.
2    Q.  Okay.  And when you reviewed it, did you
3    consider all of the answers to be true and accurate to
4    the best of your information, knowledge, and belief?
5    A.  Yes.
6    Q.  Was there anything in those answers that you
7    thought in any way was inaccurate?
8    A.  No.
9    Q.  If you would turn to Page 2 of the document --
10   and, in particular, read to yourself the question that
11   starts at No. 6 and then the response that was given --
12   the objection and response that was given to that, which
13   carries over onto Page 4.
14   A.  Okay.
15   Q.  Now, focus your attention, please, on Page 3,
16   the paragraph that starts "After dutifully paying on the
17   mortgage loan."
18        Do you see that?
19   A.  Yes.
20   Q.  It's the first --
21        Okay.  And I'll read it into the record.
22   "After dutifully paying on the mortgage loan, Plaintiff
23   began to experience a hardship in February 2017, which
24   would make it difficult to pay her loan."

---

Page 11

1         Prior to February of 2017, had you experienced
2    any difficulty in paying your loan?
3    A.  Yes.  On occasion.
4    Q.  Okay.  And, in fact, on occasion, were your
5    payments late or --
6         Were your payments late?
7    A.  Yes.  On occasion.
8    Q.  Okay.  And, on occasion, were there months
9    where the payments were submitted more than a month
10   late?
11   A.  I don't recall.
12        (Exhibit No. 2 was marked.)
13   Q.  Ms. Stoler, I'm showing you what's been marked
14   as Exhibit 2 to your deposition, which is a series of
15   letters, the first -- the first five pages of which are
16   a letter dated September 21st -- I'm sorry -- July 21st,
17   2016.
18        MR. CROWLEY:  And, actually, if I may have
19   -- just for the -- since this will be a deposition
20   exhibit, I'm actually going to cross out the loan number
21   since I notice it's still --
22        MR. POMPONIO:  Oh, okay.
23        MR. CROWLEY:  Is that okay for right now
24   for purposes of this?

---

Page 12

1    BY MR. CROWLEY:
2    Q.  And, ma'am, that's --
3         Ms. Stoler, if you would, just take a moment to
4    read those first five pages.  I'm sorry.  It's actually
5    one, two, three -- yes.  It's five pages.  Okay.  Does
6    this refresh your recollection as to whether in --
7         Well, first of all, do you recall getting this
8    document?
9    A.  No, I don't.
10   Q.  Okay.  Do you recall that your June 2016
11   payment was paid more than a month late?
12   A.  I don't.
13   Q.  Okay.  Do you recall whether you were having
14   difficulties making payments in June of 2016?
15   A.  I don't.
16   Q.  Okay.  Ms. Stoler, if you would, turn to the
17   26th page of that document.  Again, it's another
18   five-page letter, this one dated August 25th, 2016,
19   which among other things states that the loan is due for
20   September 1st, 2016.
21        Would you take a look at that document, please?
22   A.  Yes.
23   Q.  Okay.  Do you recall seeing that document
24   before?

---

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b29785143a7

Jessica Stoler                                          August 5, 2019

Page 13

1    A.  I don't.
2    Q.  Do you recall whether you were having
3  difficulty making payments in July and August of 2016?
4    A.  I don't.
5    Q.  Based on your prior statements, it's my
6  understanding you do recall that there were some
7  payments that were late prior to February of 2017,
8  correct?
9    A.  Yes.
10    Q.  Sitting here today, do you recall what it was
11  that caused those payments to be late?
12    A.  I can say that I was with my previous husband
13  who used to make the payments, so I don't recall certain
14  months that he was late on.
15    Q.  Now, if you would, look back at Exhibit 1 and,
16  again, where we were just looking in that paragraph that
17  started "After dutifully paying," it's that sentence
18  that -- that paragraph goes on to state that
19  "Plaintiff's partner suffered from liver failure and was
20  on a ventilator.  Plaintiff had to take unpaid leave to
21  take care of her partner who was helping pay for
22  household bills and was unable to work."
23    Do you see that?
24    A.  Uh-huh.  I do.

Page 14

1    Q.  And was that what caused the -- your
2  difficulties to pay that started in February of 2017?
3    A.  Yes.
4    Q.  Okay.  And did that situation start in February
5  2017, or it'd actually been going on for some time prior
6  to that, that is, your partner's medical issues that
7  were --
8    A.  He had had medical issues in the past prior to
9  us being together, however, the medical issues this time
10  with me, to the best of my recollection, started around
11  February 2017.
12    Q.  And approximately how long did -- and, as I
13  understand your answer here, you had to -- you had to
14  take unpaid leave to take care of your partner, correct?
15    A.  Correct.
16    Q.  Approximately how long were you on that unpaid
17  leave?
18    A.  He went into the hospital April 11th and
19  sometime in May.  I don't recall the exact date.  We had
20  to make a decision -- my employer and I -- regarding the
21  unpaid leave.
22    Q.  And what do you mean had to make a decision
23  regarding the unpaid leave?
24    A.  I, basically, had to leave the position.

Page 15

1    Q.  Other than leaving the position in order to
2  take care of your partner, were there any other reasons
3  for which you left the position?
4    A.  No.
5    (Exhibit No. 3 was marked.)
6    Q.  Ms. Stoler, I've handed you what's been marked
7  as Exhibit 3, which is labeled a customer certification
8  and consent and then after that has a number of -- I'm
9  sorry -- a number of other documents including a request
10  for mortgage assistance.  If you would, take a moment to
11  review that document.
12    Now that you've had the opportunity to review,
13  do you recognize this to be a request for mortgage
14  assistance that you submitted to PennyMac dated March
15  1st, 2017?
16    A.  Yes.
17    Q.  Okay.  Was that the first written request for
18  mortgage assistance that you had submitted to PennyMac?
19    A.  I don't recall.
20    Q.  Sitting here today, is there any specific fact
21  or anything you can point to that indicates that you
22  believe you may have submitted a written request earlier
23  than this?
24    A.  I don't recall submitting a prior request.

Page 16

1    Q.  Okay.  And was all of the information that you
2  provided in this request true and correct at the time
3  you submitted it?
4    A.  To my knowledge, yes.
5    (Exhibit No. 4 was marked.)
6    Q.  Ms. Stoler, I've shown you what's been marked
7  as Exhibit 4 to your deposition, which is a notice dated
8  April 7, 2017 addressed to you.  Do you recall --
9    After you've had the opportunity to review
10  this, my question is going to be do you recall receiving
11  this?
12    A.  I don't.
13    Q.  Ms. Stoler, if you'd refer back to Exhibit No.
14  1, that long interrogatory response, in particular, I'm
15  going to refer you to Page 3, which is where we were
16  just looking, that next paragraph starts, "Plaintiff
17  requested assistance from PennyMac, but was denied the
18  assistance by letter dated April 7th, 2017."
19    Does that refresh your recollection in any way
20  as to whether Exhibit 4 is a document you received
21  denying the request for a loan modification?
22    A.  I don't understand the question.
23    Q.  Okay.  In your interrogatory answer, you
24  indicated that you were denied assistance by letter

4 (Pages 13 to 16)

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                      August 5, 2019

Page 17

1  dated April 7, 2017, and I'm asking, after reviewing
2  that, whether that helps you refresh your recollection
3  in any way as to whether the document that was
4  identified as Exhibit No. 4, whether you recall getting
5  that -- that letter?
6      A.  I still don't recall getting the particular
7  letter, but it's around the time, yes, that I should
8  have.
9      Q.  And on the first page of this letter in the box
10 that's at the bottom, it states that "The U.S.
11 Department of Agriculture has a proprietary loan
12 modification program to assist struggling homeowners
13 with their mortgage payment.  Unfortunately, we are
14 unable to approve your modification request under this
15 request.  Reasons for the program denial include" -- and
16 then it has three bullet points -- "insufficient net
17 cash flow, ineligible borrowing, housing expense ration
18 outside of acceptable range."
19     Do you see that what I just read?
20     A.  I do.
21     Q.  Okay.  Did you discuss with anyone at PennyMac
22 the reasons why your request for a modification was
23 denied on April 7th, 2017?
24     A.  I don't recall.

Page 18

1      Q.  So would it be accurate then, sitting here
2  today, that you don't recall if those reasons listed
3  there were the reasons you understood at that time or
4  not?
5      A.  I don't.
6      Q.  Okay.  Do you have any recollection of anyone
7  from PennyMac giving you any other reasons or any
8  explanation whatsoever as to why the loan application
9  was denied -- the loan modification application was
10 denied on April 7th, 2017?
11     A.  No.
12     Q.  In the next sentence in the interrogatory
13 answer, you stated, "In May 2017, Plaintiff was laid off
14 from her employment and, again, requested assistance
15 from PennyMac."
16     That reference to being laid off, is that what
17 you referred to earlier as you and your prior boss
18 having to make a decision about your unpaid leave?
19     A.  Yes.
20     Q.  Okay.  Okay.  And as a result of being laid
21 off -- or after you were laid off do you recall
22 submitting a request for a forbearance agreement with
23 PennyMac?
24     A.  Yes.

Page 19

1      (Exhibit No. 5 was marked.)
2      Q.  Ms. Stoler, what I've asked to be shown to you
3  is what's been marked as Exhibit No. 5, which is a
4  document that on the first page has a fax sheet and
5  starting on the second page is labeled "Mortgage
6  Assistance Application."
7      Will you take a moment to review this?
8      A.  Yes.
9      Q.  And you recognize this to be the application
10 for the forbearance agreement that you submitted to
11 PennyMac in June of 2017?
12     A.  I -- I believe it's a request for modification
13 that turned into a forbearance.
14     Q.  And when you say it turned into a forbearance,
15 what do you mean?
16     A.  They stated that since I was unemployed and due
17 to the hardship that that would be better for me at that
18 time.
19     Q.  Were there any discussions as to whether you
20 would or would not qualify for a loan modification as
21 opposed to a forbearance?
22     A.  Yes.  It was my understanding that I would go
23 for the modification after the forbearance.
24     Q.  I'm sorry.  I missed what you said at the end

Page 20

1  there.
2      That you would go for the modification?
3      A.  After the forbearance.
4      Q.  What do you mean by that, ma'am?
5      A.  They thought it was better due to my
6  unemployment and hardship for me to be on a forbearance
7  plan.  My unemployment was a very low amount.  It was to
8  my understanding that that was the best choice at the
9  time and that after that period then I could then apply
10 for the -- for a permanent modification.
11     Q.  Okay.  And did you understand in that regard
12 that in order to apply for a permanent modification it
13 would have been necessary for you to comply with all of
14 the terms of the forbearance?
15     A.  I don't recall.
16     Q.  Was it your understanding at that time that in
17 order to be considered after the forbearance for a
18 modification that you would have had to have made all of
19 the payments required under the forbearance plan?
20     A.  I don't recall.
21     Q.  And to the extent that you had the
22 understanding that you just discussed or just described,
23 how did you obtain that understanding?  What was it
24 based on?

Sanford Reporting & Video, Inc.      sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                          August 5, 2019

Page 21

1    A.  I'm sorry.  I don't quite understand the
2    question.
3         Q.  A few moments ago you mentioned the fact that
4    it was your understanding that after the forbearance you
5    would be able to apply and be considered for a
6    modification, correct?
7         A.  Yeah.  That's --
8         Q.  What did you base that understanding on?  How
9    did you get that understanding?
10        A.  From speaking with representatives on the
11   phone.
12        Q.  When you say "representatives," that means
13   representatives of PennyMac?
14        A.  PennyMac.
15        Q.  And, at this time, do you have any recall as to
16   who you spoke with?
17        A.  I'm sorry?
18        Q.  And do you recall whether this was one or more
19   conversations?
20        A.  I think it was multiple.
21        Q.  And during what time period were these
22   conversations, if you can recall?
23        A.  I don't recall for sure.
24        Q.  Would those conversations have taken place --

Page 22

1    to the best of your recollection, would those
2    conversations take place prior to submitting the
3    application that's marked Exhibit No. 5 or both prior
4    and after?
5         A.  I believe both prior and after.
6         Q.  And were all of those communications by phone
7    or were any written?
8         A.  I believe they were by phone.
9             (Exhibit No. 6 was marked.)
10        Q.  I'm showing you what's been marked as Exhibit 6
11   to your deposition, which is a notice dated 6/30/2017.
12   And, actually, I realized that also has the loan number.
13   Let me cross out the loan number.
14            Do you want to cross it out on yours or --
15            MR. POMPONIO:  Oh, I think it's fine.
16            MR. CROWLEY:  Just since these may be
17   attached to the deposition and may end up attached to
18   motions or whatever, I think it's better that the
19   original should be redacted?
20            MR. POMPONIO:  Sure.
21   BY MR. CROWLEY:
22        Q.  Again, I'm showing you what's been marked as
23   Exhibit 6 to your deposition, which is a notice dated
24   6/30/2017, and it states you've been approved for a

Page 23

1    special forbearance plan.
2         Q.  Do you recall receiving this document?
3         A.  I do.
4         Q.  Okay.  And did you understand this to be the
5    document stating that your -- you would be given a
6    forbearance reducing the -- adjusting the monthly
7    payment to 411.73?
8         A.  Yes.
9         Q.  And then did you understand at the time it was
10   going to be a forbearance -- was scheduled to be a
11   forbearance from July of 2017 through December of 2017?
12        A.  Yes.
13        Q.  Okay.  And it was your understanding at this
14   time that under the forbearance you were required to
15   make that total monthly payment of $411.73 in each of
16   the months from July through December of 2017?
17        A.  Yes.
18        Q.  Okay.  And am I correct that you did make the
19   July, August, September payments?
20        A.  Yes.
21        Q.  And is it correct that after that you were
22   unable to make the payments because your Unemployment
23   compensation had ceased?
24        A.  Yes.

Page 24

1             MR. POMPONIO:  Wasn't there an October
2    payment as well?
3             THE DEPONENT:  I was just thinking --
4             MR. CROWLEY:  Okay.  Then I'll correct
5    that.
6    BY MR. CROWLEY:
7         Q.  So the payments were then four month payments -
8    July, August, September, and October?
9         A.  Yeah.  My apologies.
10        Q.  Okay.  My apologies for misstating that.  So
11   there were four payments and then there were two that
12   you were unable to make due to the termination of the
13   Unemployment compensation, correct?
14        A.  Correct.
15        Q.  Okay.  Thank you.
16            And, by the same token, if at any time you feel
17   there's a need to correct either your response or
18   correct what I've stated, then please let us know or
19   please let your counsel know so we can address it.
20        A.  Thank you.
21        Q.  If you would refer back to that interrogatory
22   answer -- and, yes, you'll be able to put aside all of
23   the documents that I've shown you.  I'm not going to be
24   asking you any more questions about those, so set them

6 (Pages 21 to 24)

Electronically signed by Kristen Craddock (501-329-708-7637)        ed22f9f1-188f-41ac-8192-6b29785143a7a

Jessica Stoler                                                    August 5, 2019

---

Page 25

1    aside and just make sure at some point they all go back
2    to the court reporter because they're the official
3    document.
4         Looking back at the same interrogatory answer,
5    if you would, read through it down to the point where it
6    starts -- again, starting -- read to yourself from where
7    it says "Plaintiff requested" down to the sentence that
8    starts "in November 2017 to December 2017" and then
9    through that sentence.
10    A.  Okay.
11    Q.  Okay.  And with regard to where it says "In
12   November 2017 to December 2017, Plaintiff contacted
13   PennyMac to explain about her income situation," were
14   all of those contacts by phone?
15    A.  I don't recall.
16    Q.  Do you recall?
17    A.  After those months, I tried other means other
18   than the phone, but I don't recall for those months.
19    Q.  Okay.  So you don't recall in November and
20   December before you did anything whether there were any
21   communications other than phone calls, correct?
22    A.  Correct.
23    Q.  But at some time thereafter, you did submit a
24   written application?

---

Page 26

1    A.  Yes.
2    Q.  Do you recall --
3         Well, you say that "Plaintiff contacted
4    PennyMac to explain about your income situation."  And
5    to the extent you can recall having phone calls, do you
6    recall what was said during those phone calls?
7    A.  Not exactly.
8    Q.  Can you remember approximately how many calls
9    there were?
10    A.  No.
11    Q.  When you say "not exactly," what do you -- what
12   can you recall about the conversations?
13    A.  I can't say for sure.
14    Q.  You state that "Despite several inquiries by
15   Plaintiff over a six-week period, PennyMac would not
16   respond to Plaintiff."
17         Do you see that?
18    A.  Yes.
19    Q.  Okay.  And the six-week period that you're
20   referring to there, is that the November to December
21   time frame?
22    A.  I'm not sure.
23    Q.  And when it says "PennyMac would not respond to
24   Plaintiff," do you mean -- what did you mean by that?

---

Page 27

1    A.  I tried by phone and by fax and by e-mail
2    without success.
3    Q.  When you say you tried by phone, by fax and
4    e-mail --
5         Okay.  So this would have been some time after
6    that November/December period we talked about earlier?
7    A.  Yes; yes.
8    Q.  Okay.  And sitting here today, you don't recall
9    specifically what six-week period that was?
10    A.  Not specifically.
11    Q.  Do you recall a time period --
12         Do you recall in November and December that
13   PennyMac had left phone messages on your answering
14   machine in response to your calls?
15    A.  I don't recall.
16    Q.  Can you estimate how many times during the
17   six-week period you tried by phone?
18    A.  I can't.
19    Q.  I'm sorry?
20    A.  I cannot.
21    Q.  Okay.  And how about by fax?
22    A.  I cannot estimate an amount.
23    Q.  Okay.  And how about by e-mail?
24    A.  I cannot estimate an amount.

---

Page 28

1    Q.  Did you keep copies of any of those e-mails or
2    the faxes?
3    A.  I don't recall.
4    Q.  Is it your understanding -- and to the extent
5    you would have kept any, you would have provided them to
6    your counsel?
7    A.  If I had them.
8    Q.  That's what I meant.
9         If you had them, you would have turned them
10   over to your counsel?
11    A.  Yes.
12    Q.  Okay.  Did you make notes of any of the phone
13   calls?
14    A.  I did at the time.
15    Q.  And what happened to those notes?
16    A.  I'm not sure.
17    Q.  Do you know if those notes were turned over to
18   your counsel?
19    A.  I don't recall.
20         (Exhibit No. 7 was marked.)
21    Q.  Would you please look at Exhibit No. 7, which
22   is a notice dated December 5, 2017, addressed to you.
23   And let me know when you've had an opportunity to do so.
24    A.  Okay.

---

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                                    August 5, 2019

Page 29

1    Q.  And do you recall receiving this letter?
2    A.  I don't.
3    Q.  Do you recognize this letter at all?
4    A.  No.
5    Q.  Do you recall being advised by PennyMac in any
6    manner in early December of 2017 that you did not
7    qualify for a further forbearance plan because you had
8    defaulted under the prior forbearance plan?
9    A.  No.
10   Q.  Do you recall being told by anyone at PennyMac
11   that the reason you did not qualify for a further
12   forbearance was because you had not made all of the
13   payments due under the prior forbearance plan?
14   A.  No.
15   Q.  Okay.  This letter is addressed to 2122 21st
16   Street, Nitro, West Virginia 25143.  That is the address
17   that you would have been receiving mail from PennyMac
18   throughout this time, correct?
19   A.  Correct.
20   Q.  Okay.  And do you have any reason, sitting here
21   today, to believe that you did not receive this letter
22   in or about December of 2017?
23   A.  No.
24   Q.  In the middle here, there's a list that -- it

Page 30

1    says, "Please don't hesitate to call me between the
2    hours of 7:00 a.m. and 4:00 p.m.," and it lists Joshua
3    Price.
4        Did you reach out to Mr. Price?
5    A.  I recall that name, speaking with him before.
6    I can't recall dates.
7    Q.  When you say you recall speaking with him
8    before, do you mean speaking with him before this letter
9    or just speaking with him in general?
10   A.  In general, the name sounds familiar as to one
11   of the people from there that I'd spoken with.
12   Q.  Okay.  But sitting here today, you don't recall
13   when the calls were?
14   A.  No.
15   Q.  Do you recall the subject matter of the calls?
16   A.  Me trying to get assistance with my loan.
17   Q.  Do you recall anything more specific about the
18   calls with him other than that?
19   A.  No.
20   Q.  Do you recall anything he told you in response
21   to your requests?
22   A.  (No verbal response.)
23   Q.  Other than Mr. Price's name, do you recall the
24   name -- any other names of persons you may have spoken

Page 31

1    to at PennyMac?
2    A.  Not really.  There were so many.
3    Q.  Do you know if you made notes of any telephone
4    calls with Mr. Price?
5    A.  I remember sitting at work with Post-It notes
6    everywhere, yes, but I don't think that any of them made
7    it this far.
8    Q.  When you say you recall sitting at work with
9    Post-It notes, what time period would that have been?
10   A.  That was a little later.  That would have had
11   to have been January and past.
12   Q.  Okay.  Would it be correct that from February
13   of -- sometime in February of 2017, when you had to take
14   an unpaid leave to assist your partner, that from then
15   until January 2nd of 2018 that you were not employed?
16   A.  Correct.  I --
17       Did you say February of '17?
18   Q.  Yes.
19   A.  Okay.  That's actually a little bit off because
20   I didn't leave work until, I believe, April of '17.
21   Q.  Okay.  The unpaid leave started in April?
22   A.  Uh-huh.
23       (Exhibit No. 8 was marked.)
24   Q.  Okay.  Okay.  Ms. Stoler, I'm showing you

Page 32

1    what's been marked as Exhibit 8 to your deposition,
2    which is a mortgage assistance application that's filled
3    out in handwriting and on the -- looks like on the sixth
4    page has a borrower's signature.  Let me know when
5    you've had the opportunity to review that.
6    A.  What am I looking for?
7    Q.  Well, first of all, I'd just ask that if in
8    general you recall seeing that document.  I had said
9    that there's a borrower's signature on what appears to
10   be the sixth page.
11   A.  Okay.
12   Q.  Do you recognize this to be a --
13       First of all, do you recognize this document?
14   A.  Yeah.
15   Q.  Okay.  Do you recognize this to be a mortgage
16   assistance application that you dated -- that you signed
17   on December 29th, 19- -- 20- -- December 29th, 2017?
18   A.  Yes.
19   Q.  Okay.  Is this an application that you
20   submitted to PennyMac?
21   A.  I believe it to be.
22   Q.  Okay.  And was this submitted by mail?
23   A.  I don't recall.  I recall that after I started
24   working in January I tried to send requests repeatedly,

8 (Pages 29 to 32)

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Jessica Stoler                                           August 5, 2019

Page 33

1   so I'm not sure -- I recall going to the post office and
2   mailing, I recall using my work's fax repeatedly trying
3   to get them the requested information.
4        Q.  Now, with regard to this application, it's
5   dated December 29th, 2017.  So that was before you
6   actually started working, correct?
7        A.  Uh-huh.
8        Q.  I'm sorry.  You have to say "Yes" or "No."
9        A.  Sorry.  I forgot.  Yes.
10       Q.  "Yes"?
11           Okay.  On the last page of it is a copy of a
12   prepaid -- what appears to be a prepaid mailing envelope
13   or mailing label.  Do you see that?
14       A.  Yes.
15       Q.  Do you recall utilizing something like that to
16   send the application dated December 29th?
17       A.  I don't.
18       Q.  Do you know how --
19           If it was dated December 29th, do you know when
20   it was that you actually sent it to PennyMac?
21       A.  I don't.
22       Q.  Okay.  The last page that we were just
23   referring to that looked to be the prepaid envelope or
24   prepaid label has a "Received" stamp of January 8th,

Page 34

1   2018.  Do you see that?
2        A.  I saw that.
3        Q.  Do you have any reason to believe that PennyMac
4   received the application dated December 29th, 2019 (sic)
5   prior to that January 8th, 2018 date?
6        A.  I -- I don't know.
7        Q.  Do you recall having discussions with PennyMac
8   after you submitted the application dated December 29th,
9   2019?
10       A.  Yes.
11       Q.  Okay.  And how soon after December 29th of
12   2017 -- 2017 do you recall the first conversation
13   with --
14       A.  I don't.
15       Q.  Do you know if it was within a week, within two
16   weeks?
17       A.  I don't want to guess.
18       Q.  Okay.  And I'd ask you not to guess.
19           (Exhibit No. 9 was marked.)
20       Q.  Ms. Stoler, I'm showing you what's been marked
21   Exhibit 9 to your deposition, which is a notice dated
22   January 10, 2018 from PennyMac to you.  If you would,
23   take a moment to review that.
24       A.  Yes.

Page 35

1        Q.  Do you recall receiving that document?
2        A.  No.
3        Q.  Do you recall being advised by PennyMac at some
4   point that your December 29th, 2017 application was
5   denied because it was within 37 days of the foreclosure
6   sale date?
7        A.  I do recall being told that in some form.
8        Q.  Okay.  But --
9        A.  I don't recall if it was over the phone or by
10   letter, specifically.
11       Q.  And do you recall that you were informed that
12   around January 10th of 2018?
13       A.  I don't recall specifically January 10th, 2018.
14       Q.  Do you recall whether it was the first or
15   second half of January 2018?
16       A.  I don't recall.
17       Q.  Do you recall if it was actually in January of
18   2018?
19       A.  Yes, January.
20       Q.  When do you recall being the first time that
21   you were advised that there was a foreclosure sale --
22   foreclosure sale scheduled?
23       A.  I don't recall.
24       Q.  Do you recall how you first learned that fact?

Page 36

1        A.  I don't.  It was such a stressful time.
2            (Exhibit No. 10 was marked.)
3        Q.  Ms. Stoler, I'm showing you what's been marked
4   as Exhibit 10 to your deposition, which is on the
5   letterhead of Seneca Trustees, Inc., dated January 3rd,
6   2018, and I'll represent to you at the bottom it has
7   MSJ00001 through 00004, which indicates that it was
8   produced by your counsel.  Take a minute to look at
9   this.  And my first question is going to be whether you
10   recall seeing this document before.
11       A.  Yes.  It does look familiar.
12       Q.  Okay.  And do you recall whether you received
13   it in early January of 2018?
14       A.  I don't recall for sure the date.
15       Q.  Okay.  Do you recall that you received it in
16   January of 2018?
17       A.  Yes.
18       Q.  But you don't know whether it was the first or
19   second half of the month at this point?
20       A.  I don't.
21       Q.  Okay.  And it's your understanding that the
22   foreclosure sale has never actually taken place,
23   correct?
24       A.  Correct.

9 (Pages 33 to 36)

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Jessica Stoler                                                      August 5, 2019

Page 37

1    Q.  What is your understanding as to why the sale
2  has not taken place?  And I'm not asking for anything
3  your attorney has told you.
4    A.  I'm not sure.
5    Q.  Okay.  You mentioned a few moments ago when I
6  asked if you could recall a certain date you said you
7  couldn't because that time was so stressful.
8        What did you mean by that?
9    A.  Well, my partner had almost passed away.  It
10 was a very stressful time.  He was going through rehab
11 and Unemployment ran out and I was trying to find a job
12 and just basically get by.  Yeah.
13   Q.  Okay.  And you were able to obtain employment
14 beginning January 2nd of 2018, correct?
15   A.  Correct.
16   Q.  How far in advance of that date did you know
17 you had a new job?
18   A.  It was a very quick thing.  I don't know
19 exactly how far in advance.
20   Q.  That's okay.
21        And did obtaining that job help alleviate some
22 of those stress factors you were just referring to --
23 help resolve some of those stress factors you were
24 just --

Page 38

1    A.  A little bit, but I was still in pursuit of a
2  job because it wasn't paying enough, if you will.
3  During the hardship that we went through, you know, I
4  got behind, obviously, so I was looking for something
5  better.  I continued to look for something better, more
6  higher pay.
7    Q.  The job that you started January 2nd of 2018,
8  which position was that?
9    A.  It was at Family Care.
10   Q.  And how long did you stay with that position?
11   A.  It was about a month or so.
12   Q.  I'm sorry?
13   A.  It was about a month or so.
14   Q.  Okay.  And then did you change to a new
15 position?
16   A.  Yes.
17   Q.  And what position did you change to?
18   A.  Nitro Electric.
19   Q.  So that would have been in approximately
20 February of 2018?
21   A.  Uh-huh.
22   Q.  I'm sorry.  You have to say "Yes" or "No" for
23 the court reporter.
24   A.  Yes.

Page 39

1        MR. CROWLEY:  Off the record.
2        (There was a break in the proceedings.)
3  BY MR. CROWLEY:
4    Q.  You understand if you need a break, that's up
5  to you.
6    A.  I'm okay.
7        (Exhibit No. 11 was marked.)
8    Q.  Okay.  Ms. Stoler, you've been shown what's
9  been marked Exhibit 11 to your deposition a notice dated
10 January 23rd, 2018.  Can you take a moment to review
11 this, please?
12   A.  Okay.
13   Q.  Do you recall receiving this document?
14   A.  Not specifically.
15   Q.  Do you recall after being notified by PennyMac
16 that your December 29th, 2017 application had been
17 denied for a loan mod (sic), do you recall asking
18 PennyMac to consider you for a deed --
19   A.  Vaguely.  To be honest, I don't even really
20 understand that process.  I was just trying anything to,
21 you know, get them to work with me.
22   Q.  And would those communications have been by
23 telephone or in writing, if you recall?
24   A.  Due to -- due to this, I don't recall.  I just

Page 40

1  remember, you know, contacting them in January by both,
2  you know, fax, phone.
3    Q.  Okay.  And, again, to the extent you have any
4  of those communications still -- copies of those, you
5  would have turned them over to counsel?
6    A.  Yes.
7    Q.  With regard to looking back at the
8  interrogatory answers in that Page 3, it says, "On or
9  around January 2nd, 2018, Plaintiff secured new
10 employment and possessed the willingness and ability to
11 pay her monthly mortgage payments."
12       It's my understanding you testified earlier
13 that you informed PennyMac that you could now pay --
14 starting in January that you could pay your mortgage
15 payments; is that correct?
16   A.  I don't recall if I told them that.
17   Q.  You don't recall?
18       Okay.  If you would look at the next page of
19 those interrogatories, it's the paragraph that starts
20 "Instead of putting forth a good faith effort."  Do you
21 see that?
22   A.  Yes.
23   Q.  And it states -- goes on -- and focusing in
24 particular, it says, "Plaintiff's request for loss

10 (Pages 37 to 40)

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Jessica Stoler                                                         August 5, 2019

---

Page 41

1    mitigation under applicable agreements and guidelines
2    despite inviting Plaintiff to do so and despite
3    Plaintiff's demonstrated ability to make payments."
4         Do you see that?
5    A. Yes.
6    Q. With regard to "Plaintiff's demonstrated
7    ability to make payments," that particular reference,
8    what information was provided to PennyMac showing that
9    you had an -- an ability to make payments?
10   A. I don't know.
11   Q. At the end of that paragraph it states "While
12   Plaintiff can now afford her regular monthly payments,
13   she cannot afford the arrears that have accrued as a
14   direct result of Defendant's failure to finally evaluate
15   her application for loss of mitigation assistance." Do
16   you see that?
17   A. Yes.
18   Q. Okay. At what point in time did you become
19   able to afford what would have been the regular monthly
20   payments? Let me go back a step.
21        First of all, is that statement true that I
22   just read?
23   A. I believed it to be at the time, but I was
24   continuing to look for better employment.

---

Page 42

1    Q. Okay. And when you say you believe it was at
2    the time, what do you mean?
3    A. I was willing to -- to try so hard to make
4    those payments.
5    Q. Oh, you're talking about that January time --
6    that January of 2018 time frame?
7    A. Yes. And I was hoping to keep looking for a
8    higher paying job. And at least I had one at that point
9    and I was hoping to be able to make, you know, the
10   payments and -- and also still yet for modification to
11   possibly keep the home because the payments were -- were
12   high, but I was hoping to make them.
13   Q. And when you say the payments were high, are
14   you referring to the payments of approximately $705 per
15   month?
16   A. Yes.
17   Q. Okay. And, in fact, after January of 2018, you
18   did submit the two -- approximately -- two approximate
19   payments of $705, correct?
20   A. I don't remember.
21   Q. Okay. From January of 2017 -- 2018 to the
22   present, has it been true that you would have been able
23   to afford to make the $705 payments per month?
24   A. Looking back, no.

---

Page 43

1    Q. Okay. During what period of time do you
2    believe you would have been able to make the $705
3    payments, if at all?
4    A. I'm still yet getting on my feet. I've been
5    working on it ever since all of this. I believe that --
6    myself to be now, finally.
7    Q. Okay. If you would, look at -- go to the back
8    of that document where there's some documents attached.
9    And if you would, look at the bottom there's MSJ --
10   those MSJ numbers I referred to earlier. I'm looking at
11   Exhibit MSJ000605. Do you see that? It's actually a
12   couple pages in from the back.
13   A. Yes.
14   Q. Okay. And is that a copy of an e-mail that you
15   sent to your counsel?
16   A. Yes.
17   Q. And it states towards the end of that "I did
18   send them a payment like you advised." Do you see that?
19   A. Yes.
20   Q. Does that refresh your recollection that you'd
21   made a payment of $705 in or around March 12th of 2018?
22   A. I remember making some payments, but, yeah, I
23   still don't want to say a date. I'm not sure.
24   Q. Okay. And do you recall how many payments of

---

Page 44

1    that -- do you recall --
2         To the extent that you recall making payments,
3    do you recall payments being made in the approximate
4    amount of $705?
5    A. Yes.
6    Q. Okay. And do you recall it being two or more
7    payments?
8    A. I don't.
9    Q. Okay. Under the forbearance plan that had been
10   in effect under which you had made four payments, do you
11   recall that forbearance plan that we were discussing?
12   A. Yes.
13   Q. Those payments were approximately $411 a month,
14   correct?
15   A. Yes.
16   Q. Sitting here today, at what period of time, if
17   at all, do you believe you would have been able --
18   capable of being able to continue making payments of
19   $411 a month?
20   A. I believe I could do that, yes.
21   Q. Okay. And when do you believe your ability to
22   do that started?
23   A. I can't say for sure. Probably January.
24   Q. January of?

---

11 (Pages 41 to 44)

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                    August 5, 2019

---

Page 45

1    A. '17 -- '18.
2    Q. January of '18?
3    A. I think. I'm getting the years mixed up.
4    Q. I believe January of '18 was when you started
5    working again.
6    A. Correct.
7    Q. Is that the January you meant?
8    A. Yes. Sorry.
9    Q. No. That's quite all right.
10   A. Lots of dates.
11       (Exhibit No. 12 was marked.)
12   Q. Yes.
13       Ms. Stoler, on a number of the documents,
14   you'll see that your loan number has been crossed out
15   and I'm crossing it out before I give it to you and
16   that's only because there's a possibility that some of
17   these documents when they're attached to the transcript
18   could end up in the way of court and we don't want your
19   loan number to be listed publicly. That's all. That's
20   why that's being done.
21       I'm showing what's been marked as Exhibit 12 to
22   your deposition, which is a January 25, 2018 letter from
23   -- addressed to PennyMac Loan Services. Do you recall
24   seeing this letter before?

---

Page 46

1    A. Yes.
2    Q. Okay. And is that your signature on the second
3    page?
4    A. Yes.
5    Q. Thank you.
6        And do you recall seeing this at or about the
7    time it was dated, January 25 of 2018?
8    A. I don't recall the date.
9    Q. Do you know what date it was actually sent to
10   PennyMac?
11   A. I don't.
12   Q. Do you know the means by which it was sent to
13   PennyMac?
14   A. I don't.
15   Q. Was it forwarded by your counsel's office or by
16   you? And by "forwarded," I mean sent to PennyMac.
17   A. I don't recall.
18   Q. What prompted you to send this letter?
19   A. I -- I don't recall.
20   Q. At any time prior to January 25th of 2018 had
21   you informed PennyMac in any way that you were
22   represented by counsel?
23   A. I don't remember.
24   Q. Is January 25th, 2018 about the time that you

---

Page 47

1    became represented by counsel -- around the time?
2    A. Probably around the time.
3    Q. And what was your intent in sending this
4    letter?
5    A. To try to keep my home.
6    Q. At any time after January 25 of 2018, did you
7    make any -- strike that.
8        You're aware that a lawsuit was filed in this
9    case against PennyMac in May of 2018, correct?
10   A. I --
11   Q. Filed on your behalf against PennyMac.
12   A. I can't be certain of the date --
13   Q. Okay.
14   A. -- that you mentioned.
15   Q. But you recall at some point --
16       Do you recall that at some point a lawsuit was
17   filed against PennyMac on your behalf at least several
18   months after the January 25th, 2018 letter?
19   A. Yes; yes.
20   Q. Okay. Between the time of the January 25th,
21   2018 letter and the filing of the lawsuit, do you recall
22   any other efforts that you made during that time period
23   to request assistance from PennyMac either in the
24   forbearance loan by deed or any other means of

---

Page 48

1    assistance?
2    A. I don't recall.
3    Q. Upon sending this letter, was it your
4    understanding that you would continue to receive monthly
5    statements from PennyMac?
6    A. I wasn't aware, but I don't think.
7    Q. Did you have an understanding one way or
8    another?
9    A. I don't think I have an understanding of the --
10   if I'd received monthly statements or not.
11   Q. Okay. Prior to sending this letter on January
12   25th of 2018, were you receiving what would be referred
13   to as billing -- bill collecting calls from PennyMac?
14   A. I had received them before.
15   Q. Okay. And did they cease shortly after you
16   sent this letter?
17   A. I don't recall.
18   Q. Do you recall that they -- do you recall that
19   they -- let me start --
20       Do you recall that sometime after this letter,
21   those calls stopped?
22   A. Yes. I believe so.
23   Q. Okay. Sitting here today, you don't recall how
24   shortly after this letter?

---

12 (Pages 45 to 48)

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                          August 5, 2019

Page 49

1    A.  I don't.
2    Q.  Okay.  Referring back to the documents that are
3  attached to the interrogatories, that's that exhibit,
4  right?  Looking at the page that would be labeled
5  MSJ000570 --
6        See that?
7    A.  Yes.
8    Q.  Do you recognize that to be a monthly mortgage
9  statement?
10   A.  Yes.
11   Q.  Okay.  When you sent the letter in January of
12  2018, was it your intent to direct PennyMac to no longer
13  send such statements to you?
14   A.  Yes.
15   Q.  Pardon me?
16   A.  Yes.
17   Q.  With regard to --
18        Have you produced to your counsel all of the
19  written communications that you have received from
20  PennyMac from January 25th of 2018 through the present?
21   A.  I believe that I have unless I missed any.
22   Q.  Okay.  And would you agree that most of the
23  documents that you have received from PennyMac during
24  that time period have, in fact, been the monthly

Page 50

1  mortgage statements?
2    A.  Most of them.
3    Q.  Okay.  If you would, turn to the document that
4  is labeled MSJ000574, and that's a note dated April 11,
5  2018.  Do you recall receiving that document?
6    A.  No.  Not right off.
7    Q.  Okay.  It references a payment.  It says --
8  under "About your loans," it says, "PennyMac Loan
9  Services wants to ensure that we provide you with timely
10  information regarding your loan.  The notice is to
11  advise you about your recent payment received in the
12  amount of $705."  Do you see that?
13   A.  Uh-huh.
14   Q.  And do you recall receiving that -- do you
15  recall --
16   A.  Oh, yes.  I do recall this now.
17   Q.  Okay.
18   A.  I don't recall the exact date, but, yes.
19   Q.  Okay.  A few moments ago in response to my
20  question you said it was your intent to have PennyMac
21  stop sending monthly mortgage statements.  Why did you
22  want mortgage statements no longer to be sent to
23  you?
24   A.  It was just my understanding that they were

Page 51

1  going to contact my counsel from then on.
2    Q.  Now, when you received the April -- when you
3  received the notice about the payment being received in
4  or about April of 2018, did that letter cause you stress
5  in any way?
6    A.  I wondered why they were, you know, sending it
7  and saying they were applying it to a past due balance.
8  I kind of wondered what it was about.
9    Q.  Okay.  So you were curious about it?
10   A.  Yes.
11   Q.  Okay.  Looking at the documents, we looked at
12  the one labeled 570, which is -- that was the one we
13  looked at which is a monthly statement from March of
14  2018, right?
15   A.  Yes.
16   Q.  Okay.  And looking at the next document, the
17  one starting MSJ000572, that's a monthly statement dated
18  April 11th, 2018, correct?
19   A.  Yes.
20   Q.  Okay.  And then we also just looked at the one
21  beginning at 574 that was dated April 11th that refers
22  to the loan payment, correct?
23   A.  Yes.
24   Q.  Okay.  The next is a letter dated April 17,

Page 52

1  2018, starting off, "PennyMac wants to work with you to
2  resolve" --
3        Do you see that?
4    A.  Yes.
5    Q.  Do you recall receiving that document?
6    A.  Yes.
7    Q.  Okay.  Do you recall if the four documents that
8  I've just referred -- shown you were all received before
9  the lawsuit was filed?
10   A.  I recall this one sticking out to me because I
11  believe it was -- I don't know as far as filing goes,
12  but I believe I had already spoken with counsel.  I
13  don't know for sure the dates on -- when everything was
14  filed, but, yeah, I had spoken with counsel already.
15   Q.  Okay.  Now, I don't want to specifically ask
16  you about communications between you and your attorney,
17  but at the time you would have received this April 17th,
18  2018 letter, it was your intent at that point to go
19  forward with the lawsuit?
20   A.  I don't remember.
21   Q.  Okay.  At any time prior -- any time between
22  the January 25th, 2018 letter and the filing of the
23  lawsuit, were you aware of either you or anyone else
24  contacting PennyMac to say, "Hey, I've asked that you no

13 (Pages 49 to 52)

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b29785143a7

Jessica Stoler                                                    August 5, 2019

Page 53

1   longer send me documents, but you're still sending them
2   to me"? Do you recall that?
3       A.  I'm not sure.
4       Q.  Did you ever review the complaint that was
5   filed in this litigation against PennyMac?
6       A.  Yes.  I -- yeah.
7       Q.  Is it your understanding that you are looking
8   for damages from PennyMac?
9       A.  I was just trying to keep my home.
10      Q.  Are you seeking any type of monetary damages
11  that you --
12          To your understanding, are you seeking any type
13  of monetary damages from PennyMac?
14      A.  Mostly trying to keep my home.
15      Q.  Okay.  Have you suffered any kind of medical
16  conditions or other physical conditions as a result of
17  having -- as a result of any of the actions taken by
18  PennyMac -- and I want to divide this up -- by PennyMac
19  with regard to the processing of the different attempts
20  that you had to obtain loan assistance?
21      A.  I'd say mostly just stress and anxiety.
22      Q.  And how long did that stress and anxiety exist?
23      A.  A while.
24      Q.  Approximately when did it begin?

Page 54

1       A.  I'm not sure.
2       Q.  Okay.  And has it continued?
3       A.  It's getting a little better.
4       Q.  And approximately when did it start to get a
5   little better?
6       A.  I don't know.  Here recently.
7       Q.  Okay.  And what is causing it to get better?
8       A.  I'm not sure.
9       Q.  Have you had --
10      A.  Just getting back on track, I guess.
11      Q.  Have you had to seek any kind of medical
12  assistance in connection with the stress and anxiety?
13      A.  I talked to my doctor, but, no.  Not other than
14  just, you know, a regular doctor that -- speaking with
15  him.
16      Q.  Okay.  Or any kind of medicine prescribed for
17  -- to assist you with these issues?
18      A.  No.
19      Q.  Did the stress or anxiety cause any kind of
20  physical symptoms that you're aware of?
21      A.  Just not feeling well.
22      Q.  Did it prevent you from undertaking any kind of
23  activities?
24      A.  Missing work a few times, maybe, but nothing

Page 55

1   that bad.
2       Q.  Can you estimate approximately how many times?
3       A.  I don't recall.
4       Q.  Now, with regard to the letters that are -- or
5   the communications that were sent to you after June --
6   I'm sorry -- after January 25th of 2018, did those
7   letters cause you any type of additional stress or
8   anything beyond what you'd already been experiencing?
9       A.  Not really.
10      Q.  How long did your partner's medical condition
11  continue?
12      A.  How long was he hospitalized or --
13      Q.  How long was his condition sufficiently severe
14  that it caused you -- well, let me rephrase it.
15          Did his medical condition and having to care
16  for him cause you stress and anxiety?
17      A.  Oh, sure.
18      Q.  Okay.  And approximately how long did that
19  stress and anxiety continue?
20      A.  He was hospitalized from April until August or
21  September.  I can't quite remember.  It was the
22  beginning of September-ish, but there was a lot of rehab
23  after that too.
24      Q.  So that was --

Page 56

1           If you need to take a break, we can do that.
2       A.  No.  I'm fine.  I'd rather get it over with.
3       Q.  When you're talking about August, August and
4   September of '17 or --
5       A.  I'm sorry.  I'm getting confused on the dates
6   again.
7       Q.  I understand.
8           As I understand, he was hospitalized in April
9   of 2017?
10      A.  Yes; yes.
11      Q.  So he was hospitalized until sometime in
12  August, September of 2017?
13      A.  Uh-huh.
14      Q.  And then how long did his rehab and things like
15  that continue after?
16      A.  Probably about until January of -- that would
17  be '18.
18      Q.  Did his medical condition resolve or improve
19  significantly after that date?
20      A.  Uh-huh.
21      Q.  And it has to be a "Yes" or "No."  I'm sorry.
22      A.  Yes.  Sorry, again.
23          MR. CROWLEY:  Just give me a moment.  I
24  may be finished.

14 (Pages 53 to 56)

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                           August 5, 2019

---

Page 57

1          (There was a break in the proceedings.)
2          MR. CROWLEY:  Back on.
3    BY MR. CROWLEY:
4          Q.   Earlier we were discussing the fact that the
5    foreclosure sale had been canceled, correct?
6          Do you recall that?
7          A.   Yes; yes.
8          Q.   Do you recall --
9          And it's your understanding that the -- there
10   is no sale currently scheduled, correct?
11         A.   Yes.
12         Q.   Okay.  Was the fact that the --
13         The fact that the sale was canceled, did that
14   help kind of resolve some of your anxiety and stress?
15         A.   I guess so.  Maybe slightly.  I still know
16   there was so much further to go that --
17         Q.   At any time since January of 2018 -- January
18   25th of 2018, at any time have you been informed by
19   PennyMac that the sale was going to be rescheduled?
20         A.   I don't recall being informed that.
21         Q.   Okay.  Okay.  You indicated earlier that one of
22   your intents was to have PennyMac no longer send you
23   statements.  Even if PennyMac had not sent you
24   statements, you did have an understanding that the

Page 58

1    monthly payments that were unpaid would continue to
2    accrue, correct?
3          A.   Yes.
4          Q.   Okay.  And the fact that, you know, if the
5    statements had been sent to your counsel as opposed to
6    you, that would not in any way have changed the amounts
7    that were due or the amounts which were accruing,
8    correct?
9          A.   Yes.
10         Q.   Do you recall making two small payments to
11   PennyMac in June and July -- or approximately July of
12   2018 in the amount of $20 each?
13         A.   Yes.
14         Q.   For what purpose were those payments made?
15         A.   Kind of a good faith thing because I was --
16   that's all I had at the moment.
17         Q.   And some of the statements -- some of the
18   documents that you received and provided to your counsel
19   were, in fact, statements indicating that those payments
20   had been received, correct?
21         A.   I guess so.
22         (Exhibit No. 12 was marked.)
23         MR. CROWLEY:  Just one more document.  I
24   may or may not ask any questions.

Page 59

1          Thank you.  I have nothing further.
2          THE DEPONENT:  Thank you.
3          MR. CROWLEY:  Bren, could we just --
4          The document that you copied, the note and
5    the copy of the mortgage that we -- the deed of trust
6    that we'd produced, can we just add those as exhibits to
7    the deposition saying that those are the ones we're
8    stipulating were authentic?
9          MR. POMPONIO:  Okay.
10         MR. CROWLEY:  Let me -- just to --
11         (Exhibit Nos. 13 & 14 were marked.)
12         MR. CROWLEY:  These are the ones that were
13   produced.
14         MR. POMPONIO:  Okay.
15         MR. CROWLEY:  Is that okay?
16         MR. POMPONIO:  Okay.
17         MR. CROWLEY:  So these are 13 and 14.
18   Just for the record, there's a stipulation between the
19   parties that Exhibit 13 is an authentic copy of the note
20   related to the property 2122 21st Street involving Ms.
21   Stoler, and Exhibit 14 is a deed of trust securing that
22   note, and the stipulation between the parties that these
23   documents are authentic.
24         Thank you.

Page 60

1          MR. POMPONIO:  I have a few questions.
2          You good to keep going?
3                    EXAMINATION
4    BY MR. POMPONIO:
5          Q.   You were asked some questions about the stress
6    that you've had relating to possible foreclosure of your
7    home.  Do you remember those questions?
8          A.   Yes.
9          Q.   Okay.  Have you had any trouble sleeping as a
10   result of the stress?
11         A.   Yes.
12         Q.   The --
13         Have you experienced any embarrassment or
14   humiliation as a result of the foreclosure?
15         A.   Yes.
16         Q.   Was it published in the paper?
17         A.   Yes.
18         Q.   Did you have occasion that anybody, friends, or
19   family members asked you about that foreclosure?
20         A.   Yes.
21         Q.   Okay.  And you have a daughter, right?
22         A.   Yes.
23         Q.   What's her age?
24         A.   My youngest is 19.

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b29785143a7

Jessica Stoler                                                    August 5, 2019

---

Page 61

1       Q.  Okay.  You have --
2       A.  Three.
3       Q.  You have three?
4           And just one of them lives with you; is that
5    correct?
6       A.  The two younger ones do.
7       Q.  Okay.
8       A.  My oldest one does not.
9       Q.  Okay.  And did you ever have to have any
10   discussions with your daughters about the possible
11   foreclosure?
12      A.  Yes.
13      Q.  And how did that affect you?
14      A.  It was hard.
15      Q.  When you -- when you received the
16   correspondence from PennyMac after you had identified
17   that you had a lawyer, did you worry that those -- why
18   those letters were coming to you instead of your lawyer?
19      A.  Yes.
20      Q.  Do you need a break?
21      A.  I was looking for tissues.
22          MS. FENWICK:  We had some in the other
23   room.  In fact, we call the other room our "crying room"
24   because we put tissues in there, but I'm happy to go get

---

Page 62

1    some, if you want.
2           THE DEPONENT:  Thank you.
3           (There was a break in the proceedings.)
4    BY MR. POMPONIO:
5       Q.  In January of 2018 -- I want to take you back
6    to that time period and we can talk about -- I have a
7    couple questions for you.
8           You'd obtained a job at Women's Care,
9    correct --
10      A.  Yeah.
11      Q.  -- or Family Care?
12      A.  Yeah.  I think it kind of -- they call it
13   Women's Care, Family Care.  It's the same place though.
14      Q.  And --
15          THE DEPONENT:  Thank you.  Sorry.
16          MS. FENWICK:  Oh, you're welcome.
17   BY MR. POMPONIO:
18      Q.  After you got the job at Family Care, did
19   you -- did you believe that you had the household income
20   to be able to make regular payments on your -- on your
21   mortgage?
22      A.  Yes.
23      Q.  And was it your intention in filing this case
24   to obtain some sort of stop to the foreclosure and then

---

Page 63

1    begin making payments again on your mortgage?
2       A.  Yes; yes.
3       Q.  Well, if --
4           Hypothetically speaking, had PennyMac given you
5    a modification in January of 2018 after you started
6    working at Family Care, do you believe that you would
7    have been able to --
8       A.  Yes.
9       Q.  Let me finish.
10          Do you think you'd have been able to make that
11   payment continuing forward?
12      A.  Yes.
13      Q.  Did you feel like the lawsuit was necessary for
14   you to be able to keep your home?
15      A.  Yes.
16      Q.  Let's go back and talk about the forbearance
17   agreement that you received.  Now, your -- your --
18          Was it your understanding -- I think you did
19   testify to this earlier.  Was it your understanding that
20   the forbearance was for six months?
21      A.  Yes.
22      Q.  And that during that six-month period PennyMac
23   was not going to try to foreclose on you?
24      A.  Yes.

---

Page 64

1       Q.  And that at the end of that six-month period
2    that you would be eligible for a loan modification?
3       A.  Yes.
4       Q.  Okay.  Now, the -- on Deposition Exhibit No. 6,
5    this sets out the payments for your forbearance,
6    correct?
7       A.  Yes.
8       Q.  Okay.  And it indicates here that you'd been
9    talking -- well, there's handwriting on here -- your
10   handwriting on here with some figures and stuff like
11   that, correct?
12      A.  Yes.
13      Q.  Do you know when you made those notes?  Was it
14   right around the time that you received this, or was it
15   at a later date?
16      A.  I don't recall.
17      Q.  Okay.  That's fine.
18          You see at the bottom of this notice, it says
19   "On January 1, 2018, assuming you make all of these
20   payments successfully, you'll resume making regular
21   monthly payments under the loan."
22          Do you see that notice there?
23      A.  Yes.
24      Q.  Did you understand that at the end of this

---

16 (Pages 61 to 64)

Sanford Reporting & Video, Inc.        sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                                    August 5, 2019

Page 65

1    forbearance that you would be eligible for a
2    modification or that they would just start having you
3    make the regular monthly payment?
4         A.  I thought the modification.
5         Q.  Okay.  And that was based on your conversations
6    that you had with representatives from PennyMac during
7    this time?
8         A.  Right; right.
9         Q.  Including Josh?
10        A.  Yes.
11        Q.  Okay.  Now, this payment amount that was
12   required was about -- was $411.73, correct?
13        A.  Yes.
14        Q.  Now, your Unemployment benefits --
15            How much were you getting from Unemployment?
16        A.  Around 298.
17        Q.  Every two weeks?
18        A.  Some odd change, I think, yeah.  Right under
19   $300.
20        Q.  Okay.  So about $600 a month?
21        A.  Yeah.
22        Q.  Okay.  Did you -- did you --
23            Did you have difficulty making the $411
24   payment?

Page 66

1         A.  Yeah; yeah.  It was -- yeah -- pretty hard.
2         Q.  Okay.
3         A.  Still.
4         Q.  And, obviously, PennyMac knew that you were --
5    what your income was?
6             You told them what the Unemployment income was
7    for qualify for the forbearance, correct?
8         A.  I had to send them proof of it.
9         Q.  And that Unemployment income is temporary,
10   correct?
11        A.  Correct.
12        Q.  And you testified it expired in October?
13        A.  Yes.
14        Q.  And so in November and December, you didn't
15   have any Unemployment income, correct?
16        A.  Correct.
17        Q.  Okay.  What did you do during --
18            You know, what were you thinking about and
19   what were you doing in November and December with
20   respect to your -- to your house payment?  What was your
21   plan?
22        A.  Well, it, again, was a stressful time because
23   of the rehab, but I was looking for -- looking for a
24   job.

Page 67

1         Q.  And why -- it may sound like a silly question,
2    but why were you looking for a job?
3         A.  Because the Unemployment ran out and at least
4    with the rehab I could kind of see a light at the end of
5    the tunnel, so I was trying to go back to work.
6         Q.  And was it important to you at that time to be
7    able to get some income coming in so that you could
8    afford this modification?
9         A.  Yes.
10        Q.  And did you ever think that because you weren't
11   able to make the November and December forbearance
12   payments that you weren't going to be able to still get
13   that modification in January?
14        A.  No.
15            MR. POMPONIO:  That's all I have.
16            MR. CROWLEY:  I just have a couple
17   follow-ups on those specific questions.
18            RE-EXAMINATION
19   BY MR. CROWLEY:
20        Q.  Counsel asked you a few moments ago a
21   hypothetical about if you had gotten a mod would you
22   have been able to continue to pay.  Do you recall those
23   questions he asked a few minutes ago?
24        A.  Yes.

Page 68

1         Q.  Starting in January of 2018, what amount of
2    loan payment would you have been able to afford?
3         A.  I was hoping they'd do something along the
4    lines of the forbearance or, at that point, I was
5    willing to take probably anything they would have given
6    me as far as a modification.
7         Q.  Okay.  But what do you actually think you could
8    have afforded at that point?
9         A.  I could only speculate or guess, so --
10        Q.  Well, you just answered counsel's question that
11   you thought you would be able to afford to make payments
12   and I guess my question in response to his question is
13   when you're saying you were able to make payments, what
14   payments would you have been able to make?
15        A.  I could only guess.  Maybe 500.
16        Q.  But you think that's a guess?
17        A.  Yes.
18        Q.  During the time period that you actually had
19   the forbearance, that is the July through December
20   period, other than the Unemployment, did your household
21   have any other income?
22        A.  No.
23        Q.  "No"?
24        A.  No.

17 (Pages 65 to 68)

Sanford Reporting & Video, Inc.      sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                    ed22f9f1-188f-41ac-8192-6b297851437a

Jessica Stoler                                          August 5, 2019

## Page 69

1    Q.  No income at all for the house?
2    A.  No.
3    Q.  Looking back at Exhibit 6, which is the notice
4  that you have been approved for the special forbearance
5  plan, when you received this notice, did you call anyone
6  or contact anyone at PennyMac and say, "Hey, it was my
7  understanding that, you know, once the" -- or -- I'm
8  sorry -- did you call anyone at PennyMac and say that
9  that statement that's in the box at the bottom that says
10  "On 1/1/2018," that that statement was not what you
11  understood?
12    A.  I don't know.
13    Q.  Okay.  Now, when you had discussions with
14  PennyMac -- strike that.
15    Earlier you mentioned that you had discussions
16  with people at PennyMac, perhaps, including Joshua that
17  was discussed earlier that -- about whether there would
18  be a loan mod after the forbearance.
19    Do you recall that?
20    A.  I'm sorry.  Could you repeat that?
21    Q.  Okay.  Sure.
22    Earlier you discussed in response to questions
23  from your counsel that in connection with the
24  forbearance that was issued in June of 2017, that you

## Page 70

1  had discussions with PennyMac about the fact that --
2  about whether there would be a loan mod available after
3  the forbearance expired.
4    Do you recall that?
5    A.  Yes.
6    Q.  Okay.  Now, did PennyMac tell you that you
7  would be considered for a loan mod after the forbearance
8  was expired?
9    A.  Yes.
10    Q.  Okay.  They did not tell you that you would be
11  guaranteed a loan mod, did they?
12    A.  Not that I recall.
13    Q.  Okay.  And there's nothing in writing that
14  you're aware of that says you would be given a loan mod
15  upon the expiration of the forbearance, correct?
16    A.  I don't recall a guarantee in writing.
17    Q.  And if you had anything like that -- you still
18  had anything like that, you would have provided it to
19  your counsel, correct?
20    A.  Yes.  Correct.
21    MR. CROWLEY:  Okay.  Thanks.  I have
22  nothing further.
23    THE DEPONENT:  Thank you.
24    MR. POMPONIO:  You have the right to --

## Page 71

1  after she prints out your testimony to go over it and
2  see if it's consistent with what you said, but I usually
3  just advise people to waive that because you're not
4  going to remember what you said.
5    THE DEPONENT:  Yeah.
6    MR. POMPONIO:  She'll waive.
7    (Deposition concluded at 11:49 a.m.)

## Page 72

1  STATE OF WEST VIRGINIA,
2  COUNTY OF KANAWHA, to wit:
3    I, Kristen S. Craddock, a Notary Public and
  Commissioner within and for the County and State
4  aforesaid, duly commissioned and qualified, do hereby
  certify that the attached deposition of JESSICA STOLER
5  was duly taken by me and before me at the time and place
  and for the purpose specified in the caption hereof, the
6  said witness having been by me first duly sworn.
7    I do further certify that the said deposition was
  correctly taken by me in shorthand notes, and that the
8  same were accurately written in full and reduced to
  typewriting and that the witness did request to read her
9  transcript.
10    I further certify that I am neither attorney or
  counsel for, nor related to or employed by any of the
11  parties to the action in which this deposition is taken,
  and further that I am not a relative or employee of any
12  attorney or counsel employed by the parties or
  financially interested in the action and that the
13  attached transcript meets the requirements set forth
  within article twenty-seven, chapter forty-seven of the
14  West Virginia Code.
15    My commission expires May 22nd, 2022.  Given
  under my hand this 13th day of August, 2016.
16
17  _____
18  Kristen S. Craddock
  Court Reporter
19
20
21
22
23
24

18 (Pages 69 to 72)

Sanford Reporting & Video, Inc.     sanford@sanfordreporting.com

Electronically signed by Kristen Craddock (501-329-708-7637)                ed22f9f1-188f-41ac-8192-6b297851437a